**TEXAS MUTUAL INSURANCE COMPANY, Appellant,**

v.

**Timothy J. RUTTIGER, Appellee.**

No. 01–06–00897–CV.

Court of Appeals of Texas, Houston (1st Dist.).

July 31, 2008.

653

J. Stephen Barrick, Hicks Thomas & Lilienstern, LLP, Murry B. Cohen, Akin Gump Strauss Hauer & Feld L.L.P., Houston, TX, P.M. Schenkkan, Mary A. Keeney, Graves, Dougherty, Hearon & Moody, P.C., Austin, TX, for Appellant.

Jeffrey L. Raizner, Michael P. Doyle, Doyle Raizner LLP, Byron C. Keeling, Ruth Brett Downes, Keeling & Downes, P.C., Houston, TX, for Appellee.

Panel consists of Justices NUCHIA, JENNINGS, and KEYES.

## OPINION ON REHEARING

TERRY JENNINGS, Justice.

We grant appellant's motion for rehearing. *See* Tex.R.App. P. 49.3. We withdraw our January 17, 2008 opinion, substitute this opinion in its place, and vacate our January 17, 2008 judgment.

Appellant, Texas Mutual Insurance Company ("TMI"), challenges the trial court's judgment, entered after a jury trial, in favor of appellee, Timothy J. Ruttiger, in Ruttiger's suit for violations of the Texas Insurance Code,[1] breach of the duty of good faith and fair dealing, and violations of the Texas Deceptive Trade Practices Act ("DTPA").[2] TMI brings eight issues for our review. In its first three issues, TMI contends that the evidence is legally insufficient to support the jury's findings that TMI violated the Insurance Code by engaging in unfair and deceptive acts or practices, breached the common law duty of good faith and fair dealing, violated the DTPA, and "knowingly" engaged in unfair and deceptive acts or practices. In its fourth, fifth, and sixth issues,

TMI contends that the trial court erred in awarding damages for physical pain and suffering, physical impairment, and mental anguish as "such damages were not separate and independent from the underlying physical injury" and that the evidence is legally insufficient to support the awards for mental anguish and loss of credit reputation. In its seventh issue, TMI contends that the trial court lacked jurisdiction to award damages because Ruttiger "failed to obtain a finding by the Texas Workers' Compensation Commission [("TWCC")] that he was entitled to workers' compensation benefits." In its eighth issue, TMI contends that no cause of action exists in Texas for breach of the duty of good faith and fair dealing in the context of a workers' compensation claim.

We modify the judgment to delete that portion of the judgment awarding Ruttiger damages for his loss of credit reputation. We affirm the judgment of the trial court as modified.

## Factual and Procedural Background

In his petition, Ruttiger alleged that, on June 21, 2004, he sustained bilateral inguinal hernias[3] after lifting a heavy bundle of metal conduit while working as an employee of A & H Electric Company ("A & H"). He further alleged that TMI, A & H's workers' compensation carrier, denied him timely payment of benefits and necessary medical treatment without a reasonable basis "until finally agreeing to do so, much later in a 'Benefit Dispute Agreement.'" Ruttiger contended that an unbiased inves-

---

1. *See* Tex. Ins.Code Ann. §§ 541.001–541.454, seq., 542.001–542.302 (Vernon Supp.2007).

2. *See* Tex. Bus. & Com.Code Ann. § 17.41–.63 (Vernon Supp.2007).

3. An "inguinal hernia" is a hernia into the inguinal canal, which is "the oblique passage through the layers of the lower abdominal wall that transmits the spermatic cord in the male." The American Heritage Stedman's Medical Dictionary 416 (2002).

tigation "would have confirmed" that he sustained his injuries in the workplace and TMI's wrongful and unreasonable delay in paying medical and income benefits caused him substantial financial hardship and medical problems. Ruttiger attached to his petition a copy of the January 6, 2005 Benefit Dispute Agreement, wherein TMI agreed that Ruttiger sustained a compensable injury in the form of a hernia and that Ruttiger suffered a disability for a specific period of time.[4]

At the conclusion of trial, the jury found that TMI failed to comply with its duty of good faith and fair dealing, engaged in unfair and deceptive acts or practices, and engaged in these acts and practices knowingly. The jury awarded Ruttiger $37,500 for past physical pain and suffering, $5,000 for future physical pain and suffering, $11,500 for past damage to credit reputation, $5,000 for future damage to credit reputation, $4,500 for past physical impairment, $100,000 for past mental anguish, and $20,000 in additional damages based on its finding that TMI's conduct was committed knowingly.[5] The trial court rendered judgment in Ruttiger's favor on his Texas Insurance Code theory of liability, awarded Ruttiger $163,500 in actual damages and $20,000 in additional damages, and stated that in the event the Insurance Code theory failed on appeal, Ruttiger could "elect to recover his damages under the common law for breach of the duty of good faith and fair dealing and/or under the [DTPA]."

## Jurisdiction

In its seventh issue, TMI argues that the trial court lacked subject matter jurisdiction because Ruttiger "failed to obtain a finding by the [TWCC] that he was entitled to workers' compensation benefits." It asserts that Texas courts have no jurisdiction to award damages against an insurer for a "denial in payment of compensation benefits without a determination by the TWCC that such benefits [are] due." TMI contends that the Benefit Dispute Agreement was merely a compromise, not a determination by the TWCC as to whether Ruttiger was entitled to workers' compensation benefits, and treating it as a TWCC determination would permit "the parties to create subject matter jurisdiction" and would result in a "chilling effect" on settlements.

■ This Court has previously considered, and rejected, similar arguments. In *In re Texas Workers' Compensation Insurance Fund*, a claimant sustained an injury in the course and scope of his employment, and the workers' compensation carrier initially paid him medical and income benefits. 995 S.W.2d 335, 335 (Tex. App.-Houston [1st Dist.] 1999, no pet.). The parties then entered into their first benefit dispute agreement, agreeing that certain medical problems were "causally related" and that the insurer would pay "reasonable and necessary medical." *Id.* at 336. However, the insurer subsequently began denying payments, and the parties entered into two additional benefit dispute agreements, with the insurer agreeing to pay the claimant supplemental income benefits for specific amounts. *Id.* Prior to entering into the third agreement, the claimant sued the insurer, alleging that the insurer failed to timely pay the benefits that it had agreed to pay. *Id.*

---

4. All parties agree that, after entering into the Benefit Dispute Agreement, TMI paid Ruttiger income and impairment benefits, Ruttiger received surgery for his injuries, and Ruttiger received all the benefits that he was entitled to receive under the Benefit Dispute Agreement.

5. *See* TEX. INS.CODE ANN. § 541.152(b) (Vernon Supp.2007).

The insurer argued that the claimant failed to exhaust his administrative remedies. *Id.* We disagreed. *Id.*

We noted that the Texas Workers' Compensation Act (the "Act")[6] provides a four-tier system for the disposition of claims by the TWCC. *See id.* at 336–37. In the first tier, the parties participate in a "benefit review conference" conducted by a "benefit review officer." TEX. LAB.CODE ANN. §§ 410.021–.034 (Vernon 2006 & Supp. 2007). The conference, which is a "nonadversarial, informal dispute resolution proceeding," is designed to "mediate and *resolve* disputed issues by agreement of the parties." *Id.* § 410.021(3) (Vernon 2006) (emphasis added). In the second tier, *"[i]f issues remain unresolved* after a benefit review conference, the parties, by agreement, may elect to engage in arbitration," and, absent an agreement, a party is entitled to seek relief at a contested case hearing. *Id.* §§ 410.104, 410.151–.169 (Vernon 2006 & Supp.2007) (emphasis added). In the third tier, a party may seek review by an administrative appeals panel. *Id.* §§ 410.201–.208 (Vernon 2006 & Supp. 2007). Finally, in the fourth tier, an aggrieved party may seek judicial review. *Id.* §§ 410.251–.308 (Vernon 2006 & Supp. 2007).

The statutory scheme specifically provides that "the division shall schedule a contested case hearing . . . *if the disputed issues are not resolved* at the benefit review conference." *Id.* § 410.025 (Vernon 2006) (emphasis added). Furthermore, "[a] dispute *may be resolved* in whole or in part at a benefit review conference," and, following the conclusion of the benefit review conference, the benefit review officer shall reduce the agreement to writing to be signed by the officer and each party. *Id.* § 410.029(a) (Vernon 2006). This agreement *"is binding* on the insurance carrier *through the conclusion of all matters relating to the claim,* unless the commission or a court, on a finding of fraud, newly discovered evidence, or other good or sufficient cause, relieves the insurance carrier of the effect of the agreement." *Id.* § 410.030(a) (Vernon 2006) (emphasis added). "If a dispute *is not entirely resolved* . . ., the benefit review officer shall prepare a written report that details each issue that is not resolved at the conference." *Id.* § 410.031(a) (Vernon 2006) (emphasis added).

▮ Under the plain language of the Act, the TWCC, the claimant, and the insurance provider can enter into a binding written agreement that resolves all disputed issues. The Act does not require a claimant, who has entered into a binding written agreement to settle his benefits dispute, to continue through all four tiers of the disposition process. *See In re Texas Workers' Compensation Ins. Fund,* 995 S.W.2d at 336–37.[7]

Here, the parties signed the Benefit Dispute Agreement, agreeing that Ruttiger sustained a compensable injury in the form of a hernia on June 21, 2004 and suffered from a disability for a certain time. The Benefit Dispute Agreement provided that it "shall be complied with within five days

---

6. *See* TEX. LAB.CODE ANN. chs. 409–419 (Vernon 2006 & Supp.2007).

7. We note that section 410.151 provides that an issue "that was resolved at a benefit review conference may not be considered [at a contested case hearing] unless the parties consent." TEX. LAB.CODE ANN. § 410.151 (Vernon 2006). Thus, the Act does appear to provide an avenue whereby the parties, by agreement, may proceed in the administrative process with an issue that has already been resolved by agreement. *See id.* However, there is no evidence that the parties entered into any such agreement in this case and, thus, the Benefit Dispute Agreement here remained a binding agreement on all parties.

of the approved agreement being received by the carrier." Accordingly, we hold that the Benefit Dispute Agreement constituted a final determination that benefits were due to Ruttiger and that the trial court had subject matter jurisdiction to hear Ruttiger's case.

In support of its argument that the trial court did not have subject matter jurisdiction, TMI relies on *American Motorists Insurance Company v. Fodge*, 63 S.W.3d 801 (Tex.2001). However, *Fodge* is substantively distinguishable. In *Fodge*, the carrier initially denied the claimant compensation benefits. *Id.* at 802. However, after an officer at a contested case hearing found that Fodge had suffered a compensable injury, she and the carrier stipulated that her disability lasted 20 days, the hearing officer ordered payment of temporary income benefits, and the carrier complied. *Id.* Fodge never sought or complained about the carrier's denial of medical benefits. *Id.* She then sued the carrier, alleging that the carrier had denied and delayed payment for medical benefits, had underpaid and delayed payment of the awarded income benefits, and had failed to pay her additional income benefits that were never awarded. *Id.* The carrier filed a motion to dismiss, arguing that the claims were based on a denial of benefits that only the TWCC has jurisdiction to award. *Id.* at 803.

The Texas Supreme Court held that, regarding Fodge's claims for "benefits due" and for damages caused by the insurer's bad faith "denial" of additional benefits never awarded, her "failure to obtain a commission ruling entitling her to [those] benefits [was] dispositive." *Id.* Because the TWCC had paid Fodge all of the benefits awarded to her under the agreement, the trial court had no jurisdiction to hear her claims for additional benefits or for damages caused by a bad faith denial of additional benefits. *Id.* at 804. The court explained that because "only the [TWCC] can determine a claimant's entitlement" to benefits, allowing courts to award damages for wrongful deprivation of benefits to which a claimant was not entitled "would circumvent the [TWCC's] jurisdiction." *Id.* However, regarding the claims for the carrier's bad faith delay in the payment of compensation benefits ultimately stipulated to by the carrier, the court concluded that they were "ripe for adjudication and should not have been dismissed." *Id.* at 805. Similar to these "ripe" claims in *Fodge*, Ruttiger has alleged that TMI committed bad faith in delaying payment of benefits that it ultimately agreed to pay in the Benefit Dispute Agreement. Thus, a careful reading of *Fodge* supports our holding that the trial court had subject matter jurisdiction to hear the instant claims.[8]

We overrule TMI's seventh issue.

8. In its reply brief, TMI also relies on *Pickett v. Texas Mutual Insurance Co.*, 239 S.W.3d 826 (Tex.App.-Austin 2007, no pet.). In *Pickett*, although the parties entered into a benefit dispute agreement to determine which of the claimant's disorders were causally related to a compensable injury, the court specifically noted that the agreement did not determine "what treatments would be medically necessary and reasonable for those conditions" and the carrier "remained responsible for reviewing [the claimant's] submitted medical bills and preauthorization requests to determine whether a medical treatment related to her compensable injuries or her non-compensable injuries." *Id.* at 831. The court noted that the agreement "did not resolve any issues concerning [the claimant's] entitlement to medical benefits," and, thus, the claimant was required to exhaust administrative remedies and obtain a favorable determination from the Commission before proceeding to court. *Id.* at 837. Here, there is no suggestion in the record that, following the parties' entry into the Benefit Dispute Agreement, any dispute remained regarding what specific benefits Ruttiger was entitled to recover. Again, both

### Insurance Code Violations

In its first issue, TMI argues that the evidence is legally insufficient to support the jury's finding that TMI violated the Texas Insurance Code by engaging in unfair and deceptive acts or practices because the facts "conclusively prove that TMI had a reasonable basis to dispute Ruttiger's claim, and there is no evidence that a reasonable insurer would have concluded, based on all the information available, that coverage was reasonably clear."

Because TMI did not have the burden of proof at trial, it must demonstrate that there is no evidence to support the jury's adverse finding. *Scottsdale Ins. Co. v. Nat'l Emergency Servs., Inc.*, 175 S.W.3d 284, 300 (Tex.App.-Houston [1st Dist.] 2004, pet. denied). If more than a scintilla of evidence supports the finding, the no-evidence challenge fails. *Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 552 (Tex.2004). "More than a scintilla of evidence exists where the evidence supporting the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Id.* We will sustain a legal sufficiency or "no-evidence" challenge if the record shows one of the following: (1) a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex.2005). In conducting a legal sufficiency review, a court must consider evidence in the light most favor-

---

parties suggest in their briefing that Ruttiger received all the benefits he was entitled to receive; Ruttiger's claims focus solely on TMI's delay in paying these benefits.

In its motion for rehearing, TMI argues, for the first time, that Ruttiger should have pursued medical treatment orders or interlocutory orders to provide for surgery and income benefits while the parties disputed compensability. TMI further complains that Ruttiger should have requested a benefit review conference more quickly. First, we note that TMI never raised these arguments in the trial court or in its original appellate briefing. *See* Tex.R.App. P. 33.1; *see also AVCO Corp. v. Interstate Sw., Ltd.*, 251 S.W.3d 632, 676 (Tex.App.-Houston [14th Dist.] 2007, pet. filed) ("Generally, we do not base our rulings on arguments raised for the first time on rehearing."); *OAIC Commercial Assets, L.L.C. v. Stonegate Vill., L.P.*, 234 S.W.3d 726, 747 (Tex.App.-Dallas 2007, pet. filed) ("The sole purpose of a motion for rehearing is to provide the court an opportunity to correct any errors on issues already presented."). Second, in regard to TMI's assertion that these matters relate to the trial court's jurisdiction, *Fodge* does not stand for the proposition that, by failing to seek interlocutory orders or failing to more quickly seek a benefit review conference, Ruttiger had somehow failed to exhaust his administrative remedies as to the compensability dispute before he filed suit. 63 S.W.3d 801.

In a supplemental letter to its motion for rehearing, TMI also asks us to reconsider this case in light of *Schwartz v. Insurance Co. of State of Pennsylvania*, No. 01–07–00193–CV, 2008 WL 2466258 (Tex.App.-Houston [1st Dist.] June 19, 2008, no pet. h.). In that case, this Court concluded that there had been no TWCC ruling on the disputed issue, i.e., the initial denial of surgery. *Id.* at *2. We held that "an unresolved dispute as to the surgery's medical necessity ... still existed when Schwartz filed suit." *Id.* In contrast, here, Ruttiger's suit for insurance code violations and bad faith is based upon TMI's unreasonable compensability dispute, a dispute that was resolved by the Benefit Dispute Agreement. Ruttiger has never complained that, once compensability was resolved in the Benefit Dispute Agreement, TMI delayed benefits. Applying TMI's rationale, a party would never be able to file suit against an insurer based upon a compensability dispute, no matter how unreasonable the dispute, as long as the insurer promptly provided benefits once it entered into the Benefit Dispute Agreement and agreed to compensability.

able to the verdict and indulge every reasonable inference that would support it. *Id.* at 822. If the evidence allows only one inference, neither jurors nor the reviewing court may disregard it. *Id.* However, if the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *Id.* A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement. *Id.*

In accordance with sections 541.060 and 541.061 of the Insurance Code,[9] the trial court, in question number 2, asked the jury whether TMI engaged in any of the following unfair and deceptive acts or practices:

(1) making any misrepresentation of an insurance policy by (a) making an untrue statement of fact;[10] (b) failing to state a material fact that is necessary to make other statements not misleading, considering the circumstances under which the statements were made;[11] or (c) making any statement in such a manner as to mislead a reasonably prudent person to a false conclusion of a material fact;[12] or

(2) engaging in the following unfair settlement practices with respect to a claim by an insured by (a) misrepresenting to a claimant a material fact or policy provision;[13] (b) failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which the insurer's liability has become reasonably clear;[14] (c) failing to adopt and implement reasonable standards for prompt investigation of claims arising under its policies;[15] (d) failing to provide promptly to a policyholder a reasonable explanation of the basis of the policy, in relation to the facts or applicable law, for the insurer's denial of a claim or for the offer of a compromise settlement of a claim;[16] or (e) refusing to pay a claim without conducting a reasonable investigation with respect to that claim.[17]

The jury answered "yes" to this single, broad-form question. On appeal, TMI challenges the legal sufficiency of the evidence supporting the jury's affirmative findings on all theories.

TMI first contends that there is no evidence that it failed to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which its liability had become reasonably clear and that it refused to pay a claim without conducting a reasonable investigation. *See* TEX. INS.CODE ANN. § 541.060(a)(2), (a)(7). TMI asserts that the evidence "conclusively shows" that it had "powerful reasons to dispute [Ruttiger's] claim." Ruttiger responds that TMI "had no objective evidence" to support its denial of his claim.

In addition to committing an unfair and deceptive act by violating subsections

---

**9.** *See* TEX. INS.CODE ANN. §§ 541.060, 541.061 (Vernon Supp.2007)

**10.** *See id.* (Vernon Supp.2007).

**11.** *See id.* § 541.061(2).

**12.** *See id.* § 541.061(3).

**13.** *See id.* § 541.060(a)(1).

**14.** *See id.* § 541.060(a)(2)(A).

**15.** *See id.* § 542.003(b)(3) (Vernon Supp. 2007).

**16.** *See id.* § 541.060(a)(3).

**17.** *See id.* § 541.060(a)(7).

(a)(2) and (a)(7) of section 541.060, an insurer breaches its duty of good faith and fair dealing by denying or delaying payment of a claim if the insurer knew or should have known it was reasonably clear the claim was covered. *Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 49 (Tex.1997); *see also Travelers Personal Sec. Ins. Co. v. McClelland,* 189 S.W.3d 846, 852 (Tex. App.-Houston [1st Dist.] 2006, no pet.) (stating that, under Insurance Code, "insurer violates its duty of good faith and fair dealing by denying or delaying payment of a claim when the insurer knew or should have known that it was reasonably clear that the claim was covered" and that "an insurer cannot shield itself from bad-faith liability by investigating a claim in a manner calculated to construct a pretextual basis for denying a claim"); *Lundstrom v. United Servs. Auto. Ass'n–CIC,* 192 S.W.3d 78, 96 (Tex.App.-Houston [14th Dist.] 2006, pet. denied) (same); *United Servs. Auto. Ass'n v. Croft,* 175 S.W.3d 457, 471–72 (Tex.App.-Dallas 2005, no pet.) ("The common-law duty of good faith and fair dealing is breached when an insurer denies or delays payment of a claim after its liability has become reasonably clear.").[18]

■■■ As part of its common law duty, and as codified in the Insurance Code, an insurer has an obligation to conduct an adequate investigation before denying a claim. *Croft,* 175 S.W.3d at 472 (citing *State Farm Lloyds v. Nicolau,* 951 S.W.2d 444, 449 (Tex.1997)). "An insurer will not escape liability merely by failing to investigate a claim so that it can contend that

liability was never reasonably clear." *Giles,* 950 S.W.2d at 56 n. 5. However, an insurer does not act in bad faith when a reasonable investigation reveals the claim is questionable, and an insurer maintains the right to deny questionable claims without being subject to liability for the erroneous denial of the claim. *Croft,* 175 S.W.3d at 471 (citing *Aranda v. Ins. Co. of N. Am.,* 748 S.W.2d 210, 213 (Tex.1988)). A bona fide dispute about the insurer's liability on the contract does not rise to the level of bad faith. *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 17 (Tex.1994). Finally, there can be no claim for bad faith when an insurer has denied a claim that is, in fact, not covered and the insurer has not otherwise breached the contract. *Lundstrom,* 192 S.W.3d at 96.

■■■ The Texas Supreme Court has recently highlighted the appropriate legal sufficiency standard of review to be applied in insurance bad-faith cases. *See Minnesota Life Ins. Co. v. Vasquez,* 192 S.W.3d 774, 777 (Tex.2006). The court explained that, in such cases, coverage will "almost always be reasonably clear if reviewing courts must disregard all evidence that [coverage] was unclear." *Id.* Thus, appellate courts should "look at all the evidence in such cases, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Id.*

Here, the parties agree that once TMI began paying Ruttiger temporary benefits in late June 2004, TMI had secured 60 days from the date that it was notified of

---

**18.** The standards for liability under sections 541.060(a)(2) and (a)(7) and for an insurer's breach of the common law duty of good faith and fair dealing are similar and are frequently discussed together by Texas courts. *See, e.g., United Servs. Auto. Ass'n v. Croft,* 175 S.W.3d 457, 471–72 (Tex.App.-Dallas 2005, no pet.) (holding that disposition of common law duty

of good faith and fair dealing controlled disposition of claims brought under sections 541.060(a)(2) and (a)(7)). Accordingly, we refer to cases considering the sufficiency of the evidence to support both findings of Insurance Code violations and the breach of good faith and fair dealing.

Ruttiger's injury to continue to investigate or deny him compensation for his injuries. *See* Tex. Lab.Code Ann. § 409.021 (Vernon Supp.2007). Beyond this, most of the critical facts are hotly contested.

Ruttiger testified that, during the weekend prior to his injury, he coached at his daughter's softball tournament and that he suffered no pains or problems. On June 21, 2004, he returned to work, and he and his supervisor, David Martin, went to a jobsite. Ruttiger picked up a load of metal conduit, weighing approximately 40–50 pounds, and stumbled over a board in a doorway. The load shifted, and Ruttiger immediately felt burning pain. Ruttiger told Martin "what happened" and that he needed medical attention. After Martin told Ruttiger that they could not leave the job site, Ruttiger arranged for his wife to take him to the University of Texas Medical Branch–Galveston ("UTMB"). There, Dr. Pamela Havlen, who had an immediate opening, examined Ruttiger and diagnosed him as suffering from two hernias, "one on each side."

When a nurse asked Ruttiger about payment, he called A & H and spoke with April Beall, A & H's owner, and she told him to "file it on Workers' Comp." She also gave him a policy number to provide to the nurse. Pursuant to Beall's instructions, Ruttiger stopped by A & H's office on his way home and filled out a form entitled "Employer's First Report of Injury or Illness." Ruttiger wrote in the form that he was injured "carrying heavy pipes to a jobsite." Ruttiger also identified his doctor as "Dr. William Harper, UTMB." Beall signed the form in Ruttiger's presence.

Dr. Havlen referred Ruttiger to Dr. Thomas Kimbrough, and, on July 2, 2004, Kimbrough examined Ruttiger. In his notes, Kimbrough wrote that Ruttiger "was carrying pipe at work," stumbled and

felt a burning pain on his left side, "noticed a bulge on that side," "sought medical attention," "and was discovered to [also] have a smaller bulge on the right." Kimbrough also noted that Ruttiger's "left side is still tender," he "has not ever had bulges in this area prior to his accident at work," and he has had no previous operations. Kimbrough detailed Ruttiger's symptoms, diagnosed him with bilateral inguinal hernias, and scheduled surgery for July 14, 2004.

Ruttiger further testified that after Dr. Kimbrough's examination, neither A & H nor TMI contacted him further and he did not anticipate any problems with receiving his benefits. However, shortly before his scheduled surgery, Kimbrough's office called him and told him that TMI had "cancelled everything." Ruttiger then made a telephone call to TMI and spoke with Audie Culbert, the TMI adjuster assigned to Ruttiger's case. During this conversation, Culbert told Ruttiger that TMI cancelled his benefits because Ruttiger "was hurt playing softball and not hurt on the job." Ruttiger tried to explain to Culbert that he did not play softball and, instead, only coached his daughter's team. Ruttiger maintained that he was "hurt on the job," and Culbert replied, "that's not what I'm hearing," and hung up the telephone. No one from TMI contacted Ruttiger again, and Ruttiger, who remained "sore and swollen," hired a lawyer.

In contrast, Culbert testified that after receiving the claim, he, on June 28, 2004, contacted April Beall, and "she had a lot of questions about this claim." Although Ruttiger had completed the injury report form at A & H's office on the day of his injury, Beall told Culbert that Ruttiger had not reported an on-the-job injury. Beall also stated that Ruttiger had taken off work on June 17–18, 2004 to go to a softball game. She told Culbert that Hen-

ry Beall, her relative and an A & H employee, had told her that Ruttiger came to work on June 21, 2004 limping, and David Martin, Ruttiger's supervisor, told her that he "was never told of any accident." April Beall claimed that Ruttiger was not at work on a regular basis, and she did not believe Ruttiger was injured on the job. Culbert wrote in his notes that Ruttiger was "allegedly carrying some heavy pipes," and identified the "compensable injury" as a "possible hernia."

That same day, Culbert unsuccessfully attempted to contact Ruttiger twice at a phone number provided by A & H, he sent Ruttiger a letter requesting that Ruttiger contact him at a 1–800 number, and he attempted to contact Dr. William Harper at UTMB, the doctor identified on Ruttiger's injury report form. Culbert wrote in his notes, "I will try to get [Harper's telephone number] from employee once I speak with him." According to Culbert, Ruttiger never responded to his contact attempts.

Culbert further testified that, on July 7, 2004, he spoke with Henry Beall and recorded his statement, which was the only recorded statement Culbert obtained during his investigation prior to TMI's filing of its notice disputing Ruttiger's claim. In his statement, contrary to April Beall's previous representations, Henry Beall agreed that Ruttiger had informed both him and Martin that he had been injured on the job. However, Henry Beall subsequently contradicted himself in the same statement, claiming that Ruttiger had not reported any accident "on the job" and that Ruttiger did not follow proper procedure. In regard to the softball game, Henry Beall stated that he was not "totally

positive" as to whether Ruttiger had been playing softball or coaching his daughter's team. Henry Beall conceded that he did not "have verification" about the softball game. In regard to whether Ruttiger arrived at work on June 21, 2004 with a limp, Henry Beall was not "100%" sure and "couldn't say he was actually limping." During the statement, Culbert specifically asked Henry Beall if he had the name of Ruttiger's doctor. After referring to a letter in his possession, Henry Beall supplied Culbert with the name of Ruttiger's doctor.[19] The record does not indicate that Culbert ever made any attempt to contact this doctor, nor whether Culbert even asked Henry Beall for a copy of the letter.

Culbert, on July 8, 2004, again spoke with April Beall, who repeated that one of Ruttiger's co-workers told her that Ruttiger got hurt playing softball and that Ruttiger had "bragged about getting it paid by Worker's Compensation." She stated that this co-worker would provide Culbert with a recorded statement on July 9, 2004. However, Culbert did not take any recorded statements on July 9, 2004. On July 12, 2004, Culbert again spoke with April Beall, and she reiterated that Ruttiger had played softball on June 20, 2004, "and then came to work and claimed he was injured." She also told Culbert that Ruttiger had told his co-worker, "Adam," that he "was happy that he was getting his hernia repaired by Worker's Compensation/employer."

On July 12, 2004, UTMB contacted Culbert seeking preauthorization for Ruttiger's surgery. During this call, Culbert agreed that he did not ask UTMB for any medical records and did not ask for the

---

**19.** The transcript of the recorded statement indicates that the doctor identified by Henry Beall was "Tameka [ph] Pamela Hopkins." However, the recorded statement clearly reflects that Henry Beall was referring to a copy of a letter in his possession when he recited the name.

names of any of Ruttiger's doctors. Culbert informed the UTMB representative that Ruttiger's claim had been disputed because Ruttiger had been injured playing softball and not at work.[20] That same day, Culbert filed a "Notice of Refused or Disputed Claim," stating,

> The carrier disputes this claim in its entirety. The claimant did not sustain a compensable injury. The claimant did not sustain an injury in the course and scope of employment. Our investigation revealed that the [employee] was playing softball and sustained a hernia.

Despite his affirmative statements in this notice, Culbert, on cross-examination, conceded that no one ever actually saw Ruttiger playing softball and Henry Beall, who had provided the only recorded statement to date and who was the alleged source of the softball story, agreed that Ruttiger may have simply coached his daughter's team. Culbert also agreed that "a very basic rule" of conducting an investigation is to use the "three point contact," meaning that Culbert was required to contact Ruttiger, his employer, and his doctor. As an experienced adjuster, Culbert was aware that employers had financial motivations for classifying injuries as occurring off-the-job and that adjusters should be aware of these motivations. Yet, Culbert conceded that the only information upon which he relied in disputing Ruttiger's claim was information that he received from A & H, he did not speak with Ruttiger or his treating physicians, and he did

not see or request any of Ruttiger's medical records.

Although Culbert maintained that he tried to contact Ruttiger twice by telephone, Ruttiger testified that no one from TMI had ever contacted him by telephone and that his phone number remained active "24 hours a day and 7 days a week" during that time period. Also, although Culbert stated that he sent Ruttiger a letter, Ruttiger denied receiving any letter from Culbert. Moreover, although Culbert vigorously denied refusing to speak with Ruttiger, Ruttiger testified that when he, after learning of TMI's dispute, called Culbert to explain his side of the story, Culbert immediately rejected his explanation and abruptly hung up on him.

In regard to Culbert's efforts to obtain the names of Ruttiger's treating doctors and medical information, Culbert stated that he "had the wrong doctor's name" and that A & H did not have any accurate medical information. The evidence established that Ruttiger identified Dr. Harper as his treating physician on his injury report form.[21] Contrary to TMI's claims that Ruttiger was seeking to deliberately conceal the identity of his treating doctor, Ruttiger explained that he listed Dr. Harper on the injury report form because he had seen him on other occasions and that he only saw Dr. Havlen on the day of the injury because he needed immediate help.

Culbert stated that his effort to locate Dr. Harper consisted of looking on the Internet, and Culbert agreed that he did not contact UTMB directly and did not

---

20. In its original briefing, TMI stated that, during this phone call, Culbert denied preauthorization. In its motion for rehearing, TMI clarifies that during this phone call, Culbert did not deny preauthorization because doing so would have been beyond his authority as an adjuster. Instead, Culbert informed UTMB that TMI had disputed Ruttiger's claim. The record contains evidence that

supports an implied finding that UTMB cancelled Ruttiger's scheduled surgery after Culbert informed UTMB of TMI's dispute of Ruttiger's claim.

21. As noted below, TMI subsequently obtained records from Dr. Harper after the filing of this lawsuit.

send any medical record requests to UTMB. When Culbert received a telephone call from UTMB seeking preauthorization for Ruttiger's surgery, Culbert made no inquiries about the names of the treating doctors, the extent of Ruttiger's injuries, or Ruttiger's contact information. Although Culbert defended his lack of investigation, stating that he needed Ruttiger's medical authorization to obtain medical information, he, under further questioning, appeared to equivocate on this defense.

To the extent that, in some circumstances, an insurer might be justified in relying solely upon information obtained from an employer, a reasonable juror could have believed that, under the circumstances presented in this case, Culbert should have been highly suspect of the veracity of the unsubstantiated allegations he was hearing from April Beall at A & H. For example, she suggested in her first contact with Culbert that Ruttiger never reported an on-the-job injury. Yet, this representation was flatly contradicted by the injury report form filled out by Ruttiger, signed by April Beall, and provided to Culbert. April Beall's repeated allegations that Ruttiger was injured in a softball game, which served as the only specific basis for TMI's dispute, were never verified. Her representations that Henry Beall had told her that Ruttiger came to work limping on the day of the injury were not supported by Henry Beall. Additionally, Henry Beall made contradictory statements regarding whether Ruttiger even timely reported an on-the-job injury on the day of the injury. Given the evidence, no reasonable juror could have doubted that Ruttiger timely reported his injury. Finally, April Beall's promise to provide Culbert a recorded statement from a co-worker to confirm that Ruttiger was seeking compensation for an off-the-job injury never materialized. In sum, a reasonable juror could have believed that Culbert made his decision to deny Ruttiger's claim after conducting an extremely limited, one-sided investigation that produced nothing more than highly suspicious rumors and speculation from two, related employer representatives. Considering this evidence, as well as Ruttiger's direct testimony that he had, in fact, suffered an on-the-job-injury, a reasonable juror could have found that, at the time TMI denied Ruttiger's claim, coverage for Ruttiger's injuries had become reasonably clear.

Furthermore, even Culbert agreed that, under the governing rules for conducting an adequate investigation, a "rumor" could never form the basis for refusing to pay a claim. Yet, the unsubstantiated rumor that Ruttiger was actually injured playing softball, provided by April Beall, was the only specific basis used by TMI to deny Ruttiger's claim. Thus, by its own standards, as well as the standards imposed by the Insurance Code, TMI failed to fulfill its obligation to conduct an adequate investigation before denying Ruttiger's claim. A reasonable juror could have concluded that, at the time TMI denied Ruttiger's claim, there was simply no information supporting a "bona fide" coverage dispute. Contrary to TMI's argument, the evidence certainly did not "conclusively" establish "powerful reasons" to dispute Ruttiger's claim.

Based on our review of all of the evidence, we hold that the evidence is legally sufficient to support the jury's finding that TMI violated the Insurance Code and engaged in unfair settlement practices by failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which its liability had become reasonably clear and by refusing to pay a claim without conducting a reasonable investigation with respect to the claim.

In support of its legal sufficiency challenge, TMI asks us to consider additional information developed by TMI after filing its July 12, 2004 dispute. We note that "[w]hether there is a reasonable basis for denial, . . . must be judged by the facts before the insurer at the time the claim was denied." *Viles v. Security Nat. Ins. Co.,* 788 S.W.2d 566, 567 (Tex.1990). However, we recognize that TMI's post-denial evidence may be relevant because there can be no claim for bad faith when an insurer has denied a claim that is, in fact, not covered and the insurer has not otherwise breached the contract. *See Republic Ins. Co. v. Stoker,* 903 S.W.2d 338, 340–41 (Tex.1995).

After Ruttiger's attorney contacted Culbert in September 2004, TMI reopened the file and conducted an additional investigation. On September 21, 2004, Culbert obtained a recorded statement from Adam Popovich, who stated that Ruttiger had "that hernia for a long time" and Ruttiger had told him that he did not sustain a hernia at A & H. However, Popovich, in his statement, did not conclusively establish that Ruttiger's prior hernia injury was what Ruttiger was seeking compensation for, and Popovich's statement did not foreclose the possibility that Ruttiger had aggravated this pre-existing hernia. Culbert conceded that Ruttiger still would have sustained a compensable injury if he had aggravated a preexisting hernia. *See City of Pasadena v. Olvera,* 95 S.W.3d 494, 497 (Tex.App.-Houston [1st Dist.] 2002, no pet.) (stating that definition of injury "includes aggravation of a pre-existing condition").

Culbert, on December 17, 2004, also obtained a statement from David Martin, who opined that Ruttiger was not actually injured on the job. Ruttiger never told Martin that he was injured on the job, and Martin felt Ruttiger was "[t]rying to pull the wool over somebody's eyes." On the other hand, Martin also stated that he would be surprised if Ruttiger suffered from a hernia prior to June 21, 2004. Neither Popovich nor Martin provided any evidence that Ruttiger suffered the injury playing softball.

We note that, even after TMI obtained Popovich's and Martin's statements, TMI entered into the Benefit Dispute Agreement with Ruttiger, agreeing that Ruttiger sustained a compensable injury in the form of bilateral inguinal hernias on June 21, 2004. Thus, this case is unlike those cases in which a party has complained of damages caused by bad faith delay in payment of benefits that were determined to never have been due. *See Lundstrom,* 192 S.W.3d at 96. We also note that Ruttiger's testimony directly contradicts Popovich's and Martin's statements, and a reasonable juror, for the reasons cited above, could have been skeptical of at least some of the information contained in their statements.

Finally, after Ruttiger filed the instant suit, TMI discovered records from UTMB indicating that Dr. Harper had, in fact, diagnosed Ruttiger with bilateral inguinal hernias and referred him to surgery to correct the hernias in 1998. But Ruttiger provided testimony disputing TMI's trial theory that Ruttiger's hernias constituted nothing more than a preexisting condition. When asked about his medical records, Ruttiger contended that he had only learned of his 1998 hernia diagnosis in the course of this lawsuit, the pain caused by his injury in 2004 was like nothing that he had ever experienced, and he had never noticed any bulges before the injury. Ruttiger also presented some evidence from his 1998 medical records indicating that any previous hernia may have been asymptomatic and that he did not suffer from any major pain at that time. Thus, any

evidence that Ruttiger had a preexisting hernia does not establish that Ruttiger did not sustain a compensable injury in 2004. A reasonable juror, in determining whether TMI violated the Insurance Code, could have rejected the evidence developed by TMI after it had already denied Ruttiger's claim. *See City of Pasadena*, 95 S.W.3d at 497. The evidence obtained by TMI after filing its July 12, 2004 dispute does not render the evidence supporting the jury's findings that TMI violated the Insurance Code legally insufficient.

We overrule TMI's first issue.[22]

### Knowing Violation

In its third issue, TMI argues that the evidence is legally insufficient to support the jury's finding that TMI "knowingly" violated the Insurance Code because "the uncontroverted evidence shows that TMI and its representatives subjectively believed Ruttiger's claim was not valid." The trial court asked the jury, in question number two, whether TMI knowingly engaged in violations of the Insurance Code. In accordance with section 541.002 of the Insurance Code,[23] the court instructed the jury,

> "Knowingly" means actual awareness of the falsity, unfairness, or deceptiveness of the act or practice described in Question 2. Actual awareness may be inferred if objective manifestations indicate that a person acted with actual awareness.

The jury answered "yes" to this question, and, based on their affirmative answer, awarded Ruttiger $100,000 for past mental anguish and $20,000 in additional damages, both of which are recoverable only if the Insurance Code violation was committed knowingly. *See Vasquez*, 192 S.W.3d at 777.

The Texas Insurance Code does not allow policyholders to recover extra-contractual damages when insurers are merely negligent. *Id.* Rather, such damages are reserved for cases in which an insurer knew its actions were false, deceptive, or unfair. *See id.* In reviewing all the evidence, we are mindful that "extra-contractual damages should not be a routine addition to every breach-of-policy case" and that the Constitution requires exacting appellate review of damages that punish rather than compensate. *See id.* at 775.

Here, Ruttiger presented evidence that TMI did not attempt to contact him during the course of its investigation, or, at best, made only minimal efforts to do so. The jury was presented with evidence that Culbert relied solely upon April Beall's unverified statements that Ruttiger had been injured while playing softball, not on the job. More specifically, the jury heard evidence that although TMI expressly denied coverage on the ground that Ruttiger was injured playing softball, Henry Beall, an A & H employee and the alleged source of this information, did not confirm it. Culbert conceded that he did not speak with anyone who could confirm

---

**22.** Having held that the evidence is legally sufficient to support a finding that TMI engaged in unfair settlement practices on these grounds, we need not address TMI's remaining arguments in its first issue; TMI's second issue, in which it contends that the evidence is legally insufficient to support Ruttiger's alternative causes of action for breach of the common law duty of good faith and fair deal-ing and violations of the Texas Deceptive Trade Practices Act; and its eighth issue, in which it contends that no cause of action exists in Texas for breach of the duty of good faith and fair dealing in the context of a workers' compensation claim.

**23.** Tex. Ins.Code Ann. § 541.002 (Vernon Supp.2007).

that Ruttiger was injured playing softball. Most significant to the jury's "knowingly" finding, Ruttiger testified that when he called Culbert to explain his side of the story, Culbert hung up on him and refused to listen to his version of events. Although Culbert denied this, the jury was entitled not to believe Culbert. *See City of Keller,* 168 S.W.3d at 811.

Given Ruttiger's evidence that Culbert deliberately refused to speak with him, the evidence that Culbert made little to no effort to contact Ruttiger or his treating doctors prior to disputing his claim, and the evidence that Culbert instead chose to rely upon an unverified rumor supplied by A & H, the jury could have reasonably inferred that TMI was not merely negligent, but instead knowingly engaged in unfair acts that gave rise to its liability. Again, actual awareness "may be inferred if objective manifestations indicate that a person acted with actual awareness." *See* Tex. Bus. & Com.Code Ann. § 17.45(9). The jury could have reasonably concluded that TMI "knowingly" failed to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which its liability had become reasonably clear and refused to pay a claim without conducting a reasonable investigation. As summarized by Ruttiger's insurance expert at trial, by disputing Ruttiger's claim, Culbert was certifying that the statements contained in his notice of dispute were "backed up by a reasonable investigation." Here, however, as further noted by Ruttiger's expert, there was evidence supporting an implied finding that TMI "used a reason to deny the claim" that simply was not supported by the facts.

Moreover, as noted by Ruttiger, the jury was entitled to believe that Culbert's subsequent investigation into any preexisting injury suffered by Ruttiger was merely an attempt to justify Culbert's prior dispute of Ruttiger's claim. The jury could have reasonably concluded that this post-dispute investigation was not conducted to determine whether Ruttiger's preexisting condition actually disqualified him from workers' compensation coverage. In fact, Culbert conceded that, according to TMI's own standards, TMI needed "extremely persuasive medical opinions" to deny coverage based on a preexisting medical condition. He further agreed that, as of the date of trial, TMI did not have any extremely persuasive medical opinions establishing this defense.

Accordingly, we hold that the evidence is legally sufficient to support the jury's finding that TMI "knowingly" violated the Insurance Code.

We overrule TMI's third issue.

## Damages for Physical Pain and Suffering, Physical Impairment, and Mental Anguish

In its fourth and fifth issues, TMI argues that the trial court erred in awarding Ruttiger damages for physical pain and suffering, physical impairment, and mental anguish because "such damages were not separate and independent from the underlying physical injury for which Ruttiger sought and received workers' compensation benefits." TMI asserts that "physical pain and suffering, physical impairment, and mental anguish directly relate to Ruttiger's physical injury, i.e., the bilateral inguinal hernia for which he sought and received workers' compensation coverage." Alternatively, TMI asserts that even if such damages are recoverable, the evidence is legally insufficient to support the jury's award for past mental anguish.

In regard to whether damages for physical pain and suffering, physical impairment, and mental anguish are recoverable in the instant case, both parties rely on *Aranda v. Insurance Company of North*

*America,* 748 S.W.2d 210, 214 (Tex.1988). In *Aranda,* two workers' compensation carriers agreed that a covered employee suffered compensable injuries, but both carriers refused to pay benefits because they could not agree "as to which carrier bore primary responsibility." *Id.* at 211. The supreme court noted that injured employees rely on the carrier for disability benefits and medical expenses, are "dependent on the carrier for protection from *the economic calamity* of disabling injuries," and are otherwise without any "immediate recourse" for an arbitrary denial of a valid claim. *Id.* at 212 (emphasis added). Thus, the court recognized that a carrier has a duty "to deal fairly and in good faith with injured employees" in processing their claims. *Id.* at 212–13. The court concluded that, although the carrier's unreasonable failure to pay benefits might be rectified through administrative procedures, injured employees "may in the interim incur substantial damages because of *an inability to meet basic living expenses or pay for medical care.*" *Id.* at 212 (emphasis added).

The supreme court, in *Aranda,* also rejected the carriers' argument that the exclusivity provision of the TWCA barred the employee's claims, noting that "[a] claimant is permitted to recover when he shows that the carrier's breach of the duty of good faith and fair dealing or the carrier's intentional act is *separate from the compensation claim and produced an independent injury.*" *Id.* at 214 (emphasis added). The court reasoned that the remedies afforded by the TWCA "are exclusive only if the injury complained of is an injury contemplated by the Act—*a personal injury sustained in the course of employment,*" and, thus, the exclusivity provision of the TWCA "cannot be read as a bar to a claim that is not based on a job-related injury." *Id.* In regard to the specific claims asserted in *Aranda,* the court noted that the claimant alleged a breach of the duty of good faith and fair dealing "that was separate from his compensation claim for his work-related disability" and that the claimant's alleged damages caused by the carrier's failure to pay benefits included "losses to credit, reputation, and the ability to maintain a job when his credit was a matter of consideration for his employer." *Id.*

Citing *Aranda,* the Dallas Court of Appeals has more recently considered the recovery of damages against a workers' compensation carrier for denying and delaying payment of benefits. *See Hulshouser v. Tex. Workers' Compensation Ins. Fund,* 139 S.W.3d 789, 790 (Tex.App.-Dallas 2004, no pet.). Hulshouser sued the carrier for bad faith, asserting that its denial and delay in compensating him for a hernia injury aggravated that condition. *Id.* Specifically, he alleged that the carrier's unreasonable denial and delay in paying benefits resulted in permanent disability and pain that would not have occurred had he received timely medical treatment. *Id.* Hulshouser further alleged that he suffered and would continue to suffer severe physical and mental pain, suffering, anguish, impairment, loss of earning capacity, and loss of credit. *Id.* at 790–91. The trial court granted the carrier partial summary judgment on the ground that the exclusivity provision of the TWCA barred "the claim for common law damages related to the hernia condition." *Id.* at 791.

In considering the types of recoverable damages, the Dallas Court of Appeals noted that, in exchange for prompt remuneration to an employee for an on-the-job injury, the TWCA provides the exclusive remedy for on-the-job injuries and prohibits the employee from seeking common-law remedies from his employer. *Id.* at 792. The court stated that it "was undisputed that the compensable hernia-related

damages included those stemming directly from the allegedly worsened hernia injury, complications from delayed surgery, and increased impairment." *Id.* at 793. The court affirmed the trial court's dismissal of Hulshouser's claims for damages for his aggravated physical condition resulting from the insurer's denial and delay in payment of benefits. In doing so, it held that "the damages at issue directly related to the hernia condition, and that any delay of the [carrier] did not produce an 'independent injury' as that term is used in *Aranda.*" *Id.*

■ Although the Dallas Court of Appeals focused on the fact that because the TWCA affords an employee prompt remuneration with no burden of proof as to negligence, the TWCA actually prohibits the employee from seeking common-law remedies "against [his] employer or an agent or employee of the employer for ... a work related injury sustained by the employee on the job." TEX. LAB.CODE ANN. § 408.001(a) (Vernon Supp.2007). When an employee sues a carrier for its misconduct in processing his injury claim, the policy behind the exclusivity provision of the Act that protects the employer from common law claims related to workplace injuries simply does not apply. As the supreme court stated in *Aranda,*

> Liability as a result of a carrier's breach of the duty of good faith and fair dealing or intentional misconduct in the processing of a compensation claim is distinct from the liability for the injury arising in the course of employment. Injury from the carrier's conduct arises out of the contractual relationship be-

tween the carrier and the employee and is sustained after the job-related injury. *Aranda,* 748 S.W.2d at 214.

■ To the extent that *Hulshouser* suggests that an employee may not recover for the additional physical pain and suffering, impairment, or mental anguish caused by a workers' compensation carrier's misconduct in processing his claim, it ignores the plain language of *Aranda.* As stated by the Texas Supreme Court, an injured employee may in fact "incur substantial damages" as a result of an insurer's breach of its duties and such injuries, arising out of the relationship between the carrier and the employee, are "sustained after the job related injury." *Id.* at 212–14. Nothing in the TWCA or *Aranda* prohibits an employee from recovering damages for the additional aggravated injuries caused by a workers' compensation carrier's misconduct in handling his claim. Other than *Hulshouser,* TMI has not cited any authority that would so severely limit the scope of damages available to an employee against a workers' compensation carrier for its misconduct in processing a claim. Thus, we decline to follow *Hulshouser.*[24]

■ Here, in regard to the jury's awards for past and future physical pain and suffering and past physical impairment, Ruttiger asserts that "he sought to recover for the extreme physical pain and impairment that he suffered for eight months as a result of his inability to secure pain medication after TMI refused to pay for his surgery." In support of these claims, Ruttiger cites testimony from his sister, Diana Espinosa, in which she stated

---

**24.** We note that the actual holding of *Hulshouser* may be somewhat limited by the fact that the trial court had separately ruled that Hulshouser could seek damages that "did not arise from the hernia condition, including damage to his credit and/or mental anguish resulting directly from a denial of, or delay in, payment of compensation benefits." *See Hulshouser v. Tex. Workers' Compensation Ins. Fund,* 139 S.W.3d 789, 791 (Tex.App.-Dallas 2004, no pet).

that Ruttiger "got a prescription once for his pain" but then "it was gone" and there "was no more for eight months." Espinosa stated that, as a result of Ruttiger's failure to get medications, "it was horrible" and Ruttiger "couldn't get up out of a chair without making a horrible noise." Espinosa further stated that as a result of his pain and physical limitations, Ruttiger had difficulty caring for his children and performing his head-of-household duties, he "couldn't do anything outside of his apartment," and he was "stuck" there. Ruttiger also testified that his extended suffering of physical pain was "very strenuous," it was difficult going down stairs and leaving his apartment, and he "stayed in the house almost all of the time."

We hold that the trial court did not err in awarding Ruttiger damages for his physical pain and suffering and physical impairment because Ruttiger presented sufficient evidence that TMI's breach of its duty of good faith and fair dealing caused him to suffer these independent injuries "separate from [his] compensation claim." [25] *See Aranda,* 748 S.W.2d at 214.

▮▮▮▮ Alternatively, TMI argues that the evidence is legally insufficient to support the jury's award of $100,000 to Ruttiger for mental anguish damages because "no evidence shows that Ruttiger sustained compensable mental anguish." We note that, in most cases, plaintiffs may not recover mental anguish damages unless they introduce "direct evidence of the nature, duration, and severity of their mental anguish, thus establishing a substantial

disruption in the plaintiffs' daily routine." *Giles,* 950 S.W.2d at 54. In bad faith actions, "mental anguish damages will be limited to those cases in which the denial or delay in payment of a claim has seriously disrupted the insured's life." *Id.; see also Parkway Co. v. Woodruff,* 901 S.W.2d 434, 444 (Tex.1995). Although "there must be evidence that the amount found is fair and reasonable compensation," *Saenz v. Fidelity & Guar. Ins. Underwriters,* 925 S.W.2d 607, 614 (Tex.1996), a mental anguish award "cannot be determined with mathematical precision," and "can be determined only by the exercise of sound judgment." *Bentley v. Bunton,* 94 S.W.3d 561, 605 (Tex.2002).

▮▮▮▮ In support of the jury's mental anguish award, Ruttiger cites Espinosa's testimony that Ruttiger "got real depressed" because he was stuck inside his apartment. She explained,

> I saw dark circles under his eyes and I saw him laying [sic] on the couch not looking at us anymore with his head down. I saw worry. He's gotten lines— I promise you he's gotten lines on his forehead in this two-year time. It's been since all of this has gone on. And since it took eight months for him to finally get help, he has completely lost every single thing that he had. He lost his vehicle, he lost his apartment, he lost his furniture. He's lost everything and everything that he was worth to himself was gone.

25. In its reply brief, TMI argues that TMI could not be the legal cause of these damages because "Ruttiger could have obtained treatment through his group health insurance, even though his workers' compensation claim was pending and in dispute." However, Culbert testified that he never told Ruttiger to seek coverage under his group health insurance. Culbert also agreed that, if the injury was sustained on the job, as Ruttiger contended, workers' compensation would provide the applicable coverage for that claim. The jury apparently believed that TMI was liable for failing to pay the claim. Moreover, Ruttiger testified that his health insurance was not an option because he was hurt on the job, could not return to work, and his employment with A & H was terminated.

Ruttiger had "sort of" given up, and "it started getting real bad" when he did not have money "to wash [his children's] clothes" and "started selling his furniture and he just kept trying and waiting and waiting and waiting for that phone call and he never got it." Espinosa noted that ultimately Ruttiger's credit was "shot," his phone was turned off, and he was evicted from his apartment because he could not pay his rent. She stated that this was particularly hard on Ruttiger because he was a father and was used to being self-sufficient. Ruttiger was "dwindling away," felt "belittled," and was "emotionally drained." The ordeal had been "horrifying" for Ruttiger and his family.

Ruttiger himself also testified that he was "angry" because he had been accused of fraud, he was forced to stay in his house, his physical condition impacted his relationship with his daughter, and he was humiliated because he had to borrow money from his father.

Ruttiger presented the jury with evidence demonstrating that he suffered a high degree of mental pain and distress that substantially disrupted his daily life—independent from the disruptions caused by his compensable hernia injury. *See Bunton v. Bentley*, 153 S.W.3d 50, 53 (Tex. 2004) (affirming $150,000 mental anguish award based on evidence that plaintiff's ordeal had deprived him of sleep, caused him embarrassment in community, disrupted his family, distressed his children, caused him depression, and impugned his honor and integrity and that "plaintiff would never be the same"); *see also Service Lloyds Ins. Co. v. Greenhalgh*, 771 S.W.2d 688, 691–92 (Tex.App.-Austin 1989), *rev'd on other grounds*, 787 S.W.2d 938 (Tex.1990) (affirming $8,000 mental anguish award against insurer for bad faith based on evidence that employee suffered extreme embarrassment, was forced to borrow money to pay for medical care, was fired after investigator made threats to his current employer, lost sleep, felt like a failure, and had low self-esteem). Accordingly, we hold that the evidence is legally sufficient to support the jury's award of $100,000 for mental anguish damages.[26]

We overrule TMI's fourth and fifth issues.

### Damages for Loss of Credit Reputation

In its sixth issue, TMI contends that the evidence is legally insufficient to support the jury's award of $11,500 for past damage to credit reputation and $5,000 for future damage to credit reputation because he presented no evidence that he applied for credit and was turned down or charged a higher interest rate.

"To recover actual damages for loss of credit reputation, a plaintiff must show that a loan was actually denied or a higher interest rate was charged" and "[t]here must be a showing of injury, as well as proof of the amount of that injury." *EMC Mortg. Corp. v. Jones*, 252 S.W.3d 857, 872 (Tex.App.-Dallas 2008, no pet. h.) (citing *St. Paul Surplus Lines Ins. Co., v. Dal–Worth Tank Co.*, 974 S.W.2d 51, 53 (Tex.1998) *and Provident Am. Ins. Co. v. Castaneda*, 988 S.W.2d 189, 199 (Tex. 1998)). The amount of damages for the loss of credit reputation must only be es-

---

**26.** On appeal, TMI complains that Ruttiger was not entitled to a double recovery for the same damages under different categories. However, the trial court specifically instructed the jury to "consider each element [of damages] separately" and to "not include damages for one element in any other element." Unless the record demonstrates otherwise, we must presume that the jury followed these instructions. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 770–71, 773–74 (Tex.2003). There is nothing in the record to demonstrate that the jury did not follow these instructions.

tablished with the degree of certainty to which it is susceptible. *EMC Mortg. Corp.*, 252 S.W.3d at 872 (citing *Sw. Bell Tel. Co. v. Sims*, 615 S.W.2d 858, 864 (Tex. Civ.App.-Houston [1st Dist.] 1981, no writ)). Ruttiger contends that he presented the "best possible evidence" by introducing into evidence a copy of his credit report showing a negative credit rating and his financial records showing his "calamitous decline in [his] earnings after his injury." Ruttiger also cites Espinosa's testimony that Ruttiger's "credit [was] shot" and that Ruttiger got kicked out of his apartment because he "couldn't pay for it anymore."

However, Ruttiger did not present any evidence that he was actually denied credit or charged a higher interest rate, i.e., that he actually sustained damages as a result of a loss of credit reputation. Accordingly, we hold that the evidence is legally insufficient to support the jury's awards to Ruttiger for his damage to his credit reputation.

We sustain TMI's sixth issue.

### Conclusion

We modify the judgment to delete that portion of the judgment awarding Ruttiger damages for his loss of credit reputation. We affirm the judgment of the trial court as modified.