Vacated and Dismissed and Opinion filed June 25, 2009








Vacated and Dismissed and Opinion filed June 25, 2009.

 

 

In The

 

Fourteenth Court of
Appeals

_______________

 

NO. 14-07-00449-CV

_______________

 

CUNNINGHAM LINDSEY CLAIMS MANAGEMENT, INC. and GLENDA
HIGGINS, Appellants

 

V.

 

LLOYD SNYDER, Appellee

                                                                                                                                               


On Appeal from the 215th District Court

 Harris County, Texas

Trial Court Cause No. 2004B53229

                                                                                                                                               


 

O P I N I O N








In the dispositive question presented
in this appeal, we are asked whether the trial court had jurisdiction to award
damages to a workers= compensation claimant based on the conduct of the
appellants, a third-party adjuster and the adjuster=s employer, in allegedly delaying the
claimant=s spinal surgery.  When
preauthorization for the surgery was initially requested, it was denied as medically
unnecessary.  Because the claimant did not challenge this determination, he
failed to exhaust administrative remedies; thus, the trial court lacked
jurisdiction over the claimant=s contentionCon which all of his claims are basedCthat he needed surgery at that time. 
Moreover, the impediment to jurisdiction cannot be removed because the claimant
has waived the right to challenge the denial of medical necessity.  We
therefore vacate the judgment and dismiss the case with prejudice.

I.  Factual
and Procedural Background

Appellee Lloyd Snyder was employed as
a psychiatric nurse by Christus Health Gulf Coast d/b/a Christus St. Joseph
Hospital (AChristus@), a certified self-insured employer[1]
under the Texas Workers= Compensation Act.[2]  On October
9, 2002, a patient punched Snyder on his right collarbone.  Snyder sought
medical care from an emergency room within a day, and on October 14, 2002, he
visited his primary care physician, Dr. Patrick Wills.[3] 
Christus referred the claim to appellant Cunningham Lindsey Claims Management,
Inc., an independent adjusting firm (ACunningham Lindsey@), and the claim was assigned to
adjuster Glenda Higgins (AHiggins@).  We refer to Cunningham Lindsey and Higgins collectively
as the AAdjusters.@  

Snyder retained the Ogletree Law Firm
to represent him regarding this injury and changed his treating physician to
receive chiropractic care from William Langeland, D.C., and medication from
Pete Nguyen, M.D.  Snyder returned to work on October 21, 2002, but within
approximately two days, he experienced such pain that he ceased further
attempts to work.  








Dr. Langeland recommended magnetic
resonance imaging (an AMRI@), which was performed on November 20, 2002, and nerve
conduction and needle EMG studies were performed on December 2, 2002.  Dr.
Langeland then referred Snyder to an orthopaedic surgeon, Dr. Stephen Esses,
for evaluation of Snyder=s neck and back pain.  In the meantime, Higgins requested
additional examinations, including a required medical exam and a designated
doctor review.[4] 

A.        First
Preauthorization Request

On Thursday, December 19, 2002, Dr.
Esses requested preauthorization from Genex Services, Inc. (AGenex@) to perform spinal surgery.  Genex,
the preauthorization agent assigned to evaluate the request, denied
preauthorization on the ground that the surgery described was not medically
necessary.  Snyder did not timely request reconsideration or dispute the denial.

B.        Compensability
Dispute








On December 26, 2002, Higgins sent
Snyder a copy of a completed Texas Workers= Compensation Commission (ATWCC@) form known as a TWCC-21, entitled APayment of Compensation or Notice of
Refused/Disputed Claim.@  On the first page, Higgins certified that Abenefits will be paid as accrued,@ but also noted that payment was Arefused or disputed@ for a variety of reasons, some of which
were later admitted to be inapplicable.  As relevant to the arguments presented
in this appeal, Higgins disputed the compensability and extent of injury, if
any.  She also stated that the MRI results did not support a need for surgery,
and  A[t]he injury was not such which would
cause a need for any surgery to the neck or back.@ Cunningham Lindsey closed its
Houston office on January 24, 2003, ending Higgins=s employment.  Thereafter, Snyder=s claim was handled by adjusters in
other Cunningham Lindsey offices as  Snyder challenged the Adjusters= conclusions about the compensability
and extent of his injury.  

A benefit review conference held on
September 12, 2003 resulted in recommendations favoring Snyder, and Christus
requested a contested case hearing.  On November 6, 2003, the hearing officer
issued a decision and order in which she concluded that Christus waived its
right to contest compensability by failing to dispute or pay benefits within
seven days.  She further concluded that Snyder was injured in the course and
scope of his employment and found that his injury Aextends to and includes an
aggravation of the cervical area@ at C5-C6 and C6-C7 Aand osteophytes associated with these
levels.@  Christus therefore was Aordered to pay medical and income
benefits in accordance with [the] decision, the Texas Workers= Compensation Act and the [TWCC]=s Rules.@  Each of these findings and
conclusions was consistent with the prior recommendations of the benefit review
officer.

Christus appealed the hearing officer=s conclusions regarding waiver and
extent of injury, but did not challenge the independent finding of
compensability.  The hearing officer=s decision was affirmed on February
4, 2004.

C.        Second
Preauthorization Request

More than two months later, a second
request was made on April 14, 2004 for preauthorization to perform an anterior
C5-C6, C6-C7 discectomy, interbody fusion and plate.  Genex approved the
request within a day, and the surgery was performed on April 27, 2004.

D.        This
Lawsuit








Five months after his cervical
surgery, Snyder sued Christus and the Adjusters for violations of former
article 21.21 of the Insurance Code and the Deceptive Trade Practices-Consumer
Protection Act (ADTPA@).  Christus settled before trial, and a jury found that
(1) the Adjusters engaged in unfair and deceptive acts or practices that
were a producing cause of damages to Snyder, (2) Cunningham Lindsey
engaged in an unconscionable action or course of action that was a producing
cause of damages to Snyder, and (3) both Cunningham Lindsey and Higgins acted
knowingly.  Finally, the jury assessed actual and punitive damages totaling
$2,208,799, including $540,000 for future impairment.[5] 
The trial court suggested a remittitur of the jury=s entire award of damages for future
physical impairment, and Snyder agreed; thus, the jury=s award of total damages in the
amount of $2,208,799 was reduced by the settlement credit of $208,133.64 and
remittitur of $540,000, for a total award of $1,460,665.36 for actual damages,
in addition to attorneys= fees and costs.  Both Snyder and the Adjusters appeal.

II.  Issues
Presented








The Adjusters present nine issues for
review, and Snyder presents a single cross-issue.  The Adjusters direct their
first three issues to jury Question No. One, which largely tracks language from
former article 21.21 of the Texas Insurance Code.  They base their arguments on
the undisputed fact that Christus is self-insured, and thus, no insurance
policy is involved in the case.  In their first issue, they point out that
former article 21.21 of the Texas Insurance Code prohibits deceptive acts or
practices Ain the business of insurance,@ and they contend that because they
administered Christus=s self-funded workers= compensation plan, they were not
engaged in the Abusiness of insurance.@  They argue in their second issue
that the same jury question contains an invalid theory of liability because it
allows the jury to find that the Adjusters made a misrepresentation of Aself-insured insurance coverage.@  They assert that the phrase Aself-insured insurance@ is an oxymoron that is not
encompassed within former article 21.21 of the Insurance Code, and thus, the
trial court erred in submitting the question or in failing to disregard the
jury=s answer as immaterial.  In their
third issue, the Adjusters challenge the legal sufficiency of the evidence to
support the jury=s answer to the same question.

In their fourth issue, the Adjusters
shift their focus to Snyder=s DTPA theory of liability.  They contend that Snyder is not
a bona fide Aconsumer@ and therefore was not entitled to submit a DTPA-based theory to the
jury.  In their fifth issue, the Adjusters challenge the submission of a jury
question on unconscionability, arguing that Snyder did not allege in his
pre-submission pleadings that the Adjusters= conduct was unconscionable, and the
trial court abused its discretion in allowing a post-verdict amendment to add
the claim.  They contend in their sixth issue that the evidence is legally
insufficient to support the finding that Cunningham Lindsey=s conduct, considered separately from
Higgins=s conduct, was unconscionable.  In
their seventh issue, the Adjusters assert that they owed Snyder no legally
cognizable duty.

The Adjusters raise a challenge to
the trial court=s jurisdiction in their eighth issue.  Specifically, they
contend that the trial court lacked jurisdiction to award damages based on the
alleged delay in Snyder=s spinal surgery because the TWCC never required Christus to
pay for the operation.  In their ninth issue, the Adjusters assert that the
only damage claim Snyder submitted that was independent of his work-related
injury was a claim for damage to his credit reputation.  The Adjusters argue
that because the jury failed to find this type of damage, the trial court erred
in refusing to render judgment that Snyder take nothing.

In his only cross-issue, Snyder
contends the trial court erred in suggesting remittitur of all damages assessed
by the jury for future physical impairment.








III. 
Analysis

A.        Standard
of Review

We begin, as we must, with the
jurisdictional challenge presented in the Adjusters= eighth issue.  The trial court has
jurisdiction to award damages only to the extent that relief is not dependent
upon the adjudication, directly or indirectly, of a matter within the TWCC=s exclusive jurisdiction.  Cigna
Ins. Co. of Tex. v. Killion, 50 S.W.3d 17, 22 (Tex. App.CAmarillo 2001, pet. denied), judgment
corrected on reh=g, 2001 WL 617512 (Tex. App.CAmarillo June 6, 2001) (per curiam,
not designated for publication) (correcting assessment of costs). The
determination that an agency does nor does not have exclusive jurisdiction is a
question of law which we review de novo.  Subaru of Am., Inc. v. David
McDavid Nissan, Inc., 84 S.W.3d 212, 222 (Tex. 2002) (op. on reh=g).  If an agency has exclusive
jurisdiction to resolve a dispute, a party must first exhaust all
administrative remedies before a trial court has subject matter jurisdiction.  O=Neal v. Ector County Indep. Sch. Dist., 251 S.W.3d 50, 51 (Tex. 2008) (per
curiam) (citing In re Sw. Bell Tel. Co., L.P., 235 S.W.3d 619, 624B25 (Tex. 2007) (orig. proceeding)).

B.        Types of Dispute Resolution








 There are two general types of
dispute resolution under the Workers= Compensation Act: disputes regarding
compensability and extent of injury are addressed by proceedings pursuant to
chapter 410 of the Labor Code, but disputes regarding medical necessity or
preauthorization for particular treatments follow a separate procedure
instituted under chapter 413.[6]  The
requirement to exhaust administrative remedies applies to each type of
dispute.  See Pickett v. Tex. Mut. Ins. Co., 239 S.W.3d 826, 831 (Tex.
App.CAustin 2007, no pet.) (affirming
dismissal of claims concerning alleged delay of medical treatment and benefits
because benefit dispute agreement that resolved issues of causation,
relatedness, and compensability did not address specific treatments or benefits
required).  If both types of dispute are present, a claimant may exhaust
administrative remedies applicable to one but fail to exhaust administrative
remedies regarding the other.  Cf. id.  Thus, to determine whether a party
has exhausted administrative remedies, we must compare the disputes raised in
the trial court with those raised or resolved in the administrative agency.  See,
e.g., Tex. Mut. Ins. Co. v. Ruttiger, 265 S.W.3d 651 (Tex. App.CHouston [1st Dist.] 2008, pet. filed)
(comparing allegations made in the trial court with the content of benefit
dispute agreement and concluding that claimant exhausted administrative
remedies regarding matters addressed in the Agreement); Pickett, 239
S.W.3d at 837 (contrasting allegations made in the trial court with content of
a benefit dispute agreement and concluding that claimant failed to exhaust
administrative remedies regarding claims that were not addressed in the
agreement).

Snyder contends that his claims
against the Adjusters arise solely from a dispute about whether he sustained a
compensable injury.  He asserts that he required surgery to his cervical spine
in December 2002, but the Adjusters wrongfully challenged compensability.  According
to Snyder, he could not institute medical dispute resolution until the
compensability dispute was resolved, and he reasons that the compensability
dispute effectively and wrongfully delayed his surgery for more than sixteen
months.  He contends that this delay caused him permanent damage and
impairment, including chronic pain syndrome, that is independent from his
work-related injury. 













Although Snyder characterizes his
injuries as the result of a wrongful compensability dispute for which he has
exhausted his administrative remedies, his claims are dependent on the
determination that he was entitled to preauthorization of the surgery in
December 2002.  See Am. Motorists Ins. Co. v. Fodge, 63 S.W.3d 801, 804
(Tex. 2001) (concluding that the workers= compensation process Aprecludes bad faith liability for
denying benefits to which the claimant is not entitled@); Macias v. Schwedler, 135
S.W.3d 826, 830 (Tex. App.CHouston [1st Dist.] 2004, pet. denied) (dismissing bad-faith
insurance claims against carriers and claims administrators because, although
plaintiff did not seek compensation benefits at trial, Athe basis for the denial of benefits
[was] central to the lawsuit@ and only TWCC could decide that treatment was wrongfully
refused).  Only two entities could determine the medical necessity of the
surgery.  Christus, acting through the Adjusters or Genex, could have simply
preauthorized the surgery when it was initially requested, thereby waiving a
later dispute about medical necessity.[7]  This did not
happen.  Because preauthorization was denied on the asserted basis of lack of
medical necessity, Snyder=s only recourse was to obtain a ruling on medical necessity
from the TWCC by following the procedure set forth in the Texas Administrative
Code for challenging the denial.  Because Snyder did not do so, he waived the
argument that spinal surgery was medically necessary in December 2002.[8] 
Thereafter, no additional requests for preauthorization of the same surgery
could be submitted unless there was a substantial change in Snyder=s medical condition.[9] 
This, however, is apparently what happened here.  After Snyder=s condition worsened, a second
preauthorization request was submitted on April 14, 2004 and granted on April
15, 2004.  With regard to the second preauthorization request, it is undisputed
that the spinal surgery was medically necessary at that time, and it was
authorized without delay.  But the absence of a dispute regarding the second
preauthorization request does not alter the fact that, under the governing
statutes and administrative rules, resolution of any question regarding the
need for surgery in December 2002 rested exclusively with the TWCC.  See
Fodge, 63 S.W.3d at 804.  

After comparing those provisions to
the facts of this case, we conclude that Snyder failed to exhaust his
administrative remedies. 

C.        Medical Dispute Resolution Procedures








The Texas Workers= Compensation Act and the
Administrative Code dictate the procedure for establishing medical necessity
and define the point in time when a carrier is liable for the cost of spinal
surgery.  See Act of May 25, 2001, 77th Leg. R.S., ch. 1456, ' 4.01, 2001 Tex. Gen. Laws 5167,
5180 (AExcept in a medical emergency,[10]
an insurance carrier is liable for medical costs related to spinal surgery only
as provided by Section 413.014 and commission rules.@) (emphasis added) (amended 2005)
(current version at Tex. Lab. Code Ann.
' 408.026 (Vernon 2006)).  Pursuant to
section 413.004, TWCC rules were required to provide that preauthorization is
required for spinal surgery.[11]  Unless
otherwise agreed, A[t]he insurance carrier is not liable for those specified
treatments and services requiring preauthorization unless preauthorization is
sought by the claimant or health care provider and either obtained from the
insurance carrier or ordered by the commission.@[12] 

In December 2002, the determination
that a workers= compensation claimant with a compensable spinal injury was entitled to
non-emergency spinal surgery involved the following steps:

1.         First, a claimant or
health care provider had to request preauthorization for spinal surgery.[13]  









2.         The carrier (or in this
case, the self-insured employer or its agents) then had three working days to
approve or deny the request for preauthorization.[14] 
The decision was required to be Abased solely upon the reasonable and
necessary medical health care required to treat the injury, regardless of:
(A) unresolved issues of compensability, extent of or relatedness
to the compensable injury; [or] (B) the carrier=s liability for the
injury . . . .@[15] 

3.         If the request was timely
denied, then within fifteen working days of receipt of the written denial, the
claimant could request reconsideration of the preauthorization request.[16]


4.         If the request for
reconsideration also was denied, then the claimant had forty-five days[17]
to challenge the denial by filing a request for Medical Dispute Resolution by
an independent review organization (AIRO@).[18] 
An IRO decision is deemed to be a commission decision and order,[19]
and A[i]t is a defense for the carrier if
the carrier timely complies with the IRO decision with respect to the medical
necessity or appropriateness of health care for an injured employee.@[20]   

5.         A party to a medical
necessity dispute regarding spinal surgery could appeal the IRO decision by
requesting a Contested Case hearing (ACCH@).[21]








Here, the jurisdictional evidence
shows that only the first two steps occurred.  The parties do not dispute that
Dr. Esses requested preauthorization on December 19, 2002, and the evidence is
similarly uncontroverted that the request was timely denied for the sole stated
reason that such surgery was not medically necessary.[22] 
There is no evidence, however, that Snyder, his counsel, or any of his health
care providers requested reconsideration of the denial or initiated medical
dispute resolution.  Consequently, the denial of the requested preauthorization
was allowed to stand unchallenged. 

Although a request for an IRO would
have been held in abeyance until the dispute regarding compensability and
extent of injury were resolved by a final decision of the Commission,[23]
a timely IRO request still was required.  See Schwartz v. Ins. Co. of State
of Pa., 274 S.W.3d 270, 275 n.7 (Tex. App.CHouston [1st Dist.] 2008, pet.
denied) (A[T]imely resolution of medical necessity disputes is also public policy,
and the administrative steps available to resolve such disputes are guided by
mandatory time requirements . . . .@) (citing 28 Tex. Admin. Code Ann. '' 133.305, 133.308, 134.600 (2008)). 
Moreover, no similar provision extended the time to request reconsideration.  

Here, no request for reconsideration
or medical dispute resolution was filed at any time.  Instead, Snyder and his
healthcare providers filed a second request for preauthorization more than five
months after the compensability dispute ended and 71 days after a final
decision was rendered regarding the extent of injury.








Our conclusion that Snyder failed to
exhaust administrative remedies also is supported by the governing
administrative rule that specifies the time when the carrier or self-insured
employer would have become liable for the costs of spinal surgery:

The insurance carrier is liable for all reasonable and
necessary medical costs relating to the health care required to treat a
compensable injury: 

(1)       listed in subsection (h) . . . of this
section, [which includes spinal surgery,] only when the following
situations occur: 

(A)      an emergency, as defined in '133.1 of this title (relating to Definitions); 

(B)      preauthorization of [spinal surgery] was
approved prior to providing the health care; 

. . .

(D)      when
ordered by the commission . . . .[[24]]

None of these events occurred before
the second request for preauthorization was approved on April 15, 2004.

D.        Existence
of a Medical-Necessity Dispute








Snyder asserts that medical necessity
was not in dispute, and instead focuses his argument on evidence of the
following facts:  (1) Dr. Esses requested preauthorization for cervical
surgery on December 19, 2002; (2) the Adjusters contested compensability;
(3) the compensability dispute was ultimately resolved in Snyder=s favor; (4) Snyder=s condition worsened between December
19, 2002 and April 15, 2004; and (5) Genex authorized surgery on April 15,
2004.  Significantly, he fails to mention on appeal that there were two requests
to preauthorize surgery, and the first was denied as medically unnecessary.  By
overlooking Genex=s determination that surgery was not medically necessary in
2002 and the second request for preauthorization in 2004, Snyder argues that
the Adjusters responded to the 2002 request for preauthorization by denying
compensability and ultimately preauthorized the surgery in 2004 as the
result of the resolution of the compensability dispute in Snyder=s favor.  As a matter of law,
however, the procedures for raising and resolving disputes about compensability
and medical necessity are and remain separate.

Snyder further argues that he was not
required to comply with medical-dispute resolution procedures because (1)
cervical surgery was eventually preauthorized; thus, any dispute about its
necessity is barred; (2) at the time Snyder filed suit, there was no unresolved
dispute over the necessity of Snyder=s cervical surgery; (3) the TWCC does
not provide a review process for matters that are not in dispute; (4) under
Texas case law, an insured need not Aexhaust remedies@ as to matters that are not in
dispute and for which no remedy exists;  and (5) resolution of his claims did
not require the trial court to resolve an issue that lies exclusively within
the jurisdiction of an administrative agency.  Each of these arguments is based
on at least one false premise.

Concerning the first of these
arguments, Snyder states:

Not only was there no dispute about
the preauthorization of Snyder=s surgery, but the preauthorization permanently barred any
future dispute about its necessity.  See Tex. Lab. Code Ann. ' 413.014(f) (Vernon Supp. 2007) (AThe insurance carrier is liable for
health care treatment and treatment plans and pharmaceutical services that are
voluntarily preauthorized and may not dispute the certified or agreed-on
preauthorized health care treatment and treatment plans and pharmaceutical
services at a later date.@).  Thus, even if Snyder had sought to obtain a ruling on
preauthorization when the dispute no longer existed, Section 413.014(f)
statutorily barred Appellants from contesting their preauthorization.








We do not reach the merits of this
argument because this provision is inapplicable as a matter of law.  The
language of Labor Code section 413.014(f) on which Snyder relies was enacted
the year after the first request for preauthorization, and by its terms
applies only to requests for Avoluntary precertification@ occurring on, or after, September 1,
2003.[25]  Thus, even
if requests for Avoluntary precertification@ and for preauthorization are the
sameCa question we do not reachCthe statute would apply only to the
request that was granted in 2004 (and for which medical necessity is not
disputed), but would not apply to the request that was denied in 2002 (and for
which any challenge to the lack of medical necessity is waived).  Moreover, A>[t]he fact that
the . . . surgery w[as] ultimately authorized does not
constitute any type of determination by the Commission that the initial
denial . . . [was] improper.=@  Schwartz, 274 S.W.3d at 274
(quoting In re Tex. Mut. Ins. Co., No. 05‑05‑00944‑CV,
2005 WL 1763562, at *2 (Tex. App.CDallas July 27, 2005, orig.
proceeding) (mem. op.)). 








As to Snyder=s second, third, and fourth
arguments, it is true that there was no unresolved medical necessity dispute by
the time he filed this suit; however, this fact is not dispositive of the
jurisdictional issue.  Here, the reason there is no unresolved dispute is
because Snyder waived the right to dispute Genex=s determination that surgery was not
medically necessary in 2002.  Having waived that contention in the TWCC, he
cannot now litigate it in district court; his claim for damages for delayed
surgery Ais made no more viable simply by
restating it under the other legal theories@ of bad faith or statutory
violations.  See Fodge, 63 S.W.3d at 804.[26]
Stated differently, the question of whether the first preauthorization was
wrongfully deniedCand hence, whether Snyder was damaged by a wrongful delayCcan be answered only by first
determining whether spinal surgery was medically necessary in December 2002. 
That question was answered by Genex in the negative, and because Snyder failed
to timely challenge  that determination, Genex=s decision is now final.

For reasons previously discussed,
Snyder=s fifth argument, in which he
contends that his claims do not require the resolution of an issue within the
TWCC=s exclusive jurisdiction, also is
without merit.  Although Snyder insists that his claims arise solely from the
compensability dispute, he has consistently maintained that the damages that he
sought and which the jury awarded arose from the Adjusters= Aconduct in delaying medical treatment
for Snyder=s injury.@  As a result of waiver, Snyder has not and cannot exhaust
administrative remedies regarding this issue. 

E.        Absence of Remaining Claims

Although Snyder correctly notes that
the Adjusters did not challenge the sufficiency of the damage evidence, it
nevertheless is our responsibility to determine if any part of the case can be
affirmed or remanded or whether the entire case must be dismissed.  Cf.
Killion, 50 S.W.3d at 22 (reversing and remanding for new trial because the
reviewing court was Aunable to determine which of the damages awarded were
attributable to injury within the trial court=s jurisdiction and which were truly
dependent upon the jury finding that [the claimant] was entitled to back
surgery under the Act@).  We therefore have searched the record to determine if,
after setting aside any determination that spinal surgery was medically
necessary in December 2002, the trial court could properly exercise
jurisdiction over any of Snyder=s claims.  But as actually tried, each claim and damage award
was dependent upon a finding that Snyder needed surgery before April 2004.  

From voir dire through closing
argument, Snyder=s case was framed as one of delay:

[The Adjusters] looked for an excuse, didn=t pay, caused a lot of problems independent of the
original injury because of delay.[[27]] 

. . .








[D]elay, delay, delay, playing games,
gamesmanship.  It=s a weapon. . . . Delay is a
weapon. . . . It=s a weapon just like you take a gun
to somebody=s head when you use delay that way. . .  Look at the
condition they left him in. . . .  Is there any doubt that
because of the delay this man=s body was incredibly damaged?[[28]]

As Snyder testified:

Q:        In this case, your complaint is that you
wanted that neck surgeon [sic] back when Dr. Esses recommended it for you in
December of 2002; isn=t that right?

A:        Yes, sir.

Q:        You=re
not complaining that there was an interruption in your wage benefits, are you,
Mr. Snyder?

A:        Do what now?

Q:        You kept getting your wage benefits and you=re still getting them and you=re not complaining in this case that there was some
wrongful or bad interruption in your wage benefits, are you, sir?

A:        No.


His wife similarly testified:

Q:        Until that time, until you got the BRC
[benefit review conference], you thought, okay, we=re still getting the income benefits, right?

A:        Yes.

Q:        Some of his medical is being paid for?

A:        Some of it, yes.

Q:        But they=re
not agreeing to this surgery, right?

A:        That=s
true.

Q:        And that seems to be the gist of it?

A:        That=s
what I knew.

Q:        And based on your conversations with our
husband, was it your understanding that=s
the way he understood it as well?

A:        As
far as I know.  Basically, all I can remember is that we were just concerned
about trying to get the surgery approved and that was our whole point, and let
the attorneys deal with it.








The record contains no evidence of
any basis for the jury=s award of damages for physical pain and suffering, physical
impairment, and loss of earning capacity other than delayed surgery, and the
trial court lacked jurisdiction to award such damages.  Even Snyder=s mental anguish was attributed to a
delay of surgery.  According to Snyder, when he learned the effects of the
delay, it Awas one of the most devastating moments in [his] life.@  Dr. Esses similarly testified that Aas a result of delay in appropriate
treatment, [Snyder] has a chronic pain syndrome@ and Apart and parcel of chronic pain
syndrome is depression and frustration and anxiety.@  Snyder=s treating physician agreed that
Snyder suffered Aanxiety and depression as a direct result of delay in
surgery.@  In contrast, with the exception of
the claims related to the alleged delay of necessary surgery, Snyder failed to
offer A>direct evidence of the nature,
duration, or severity of [his] anguish, thus establishing a substantial
disruption in [his] daily routine,= or other evidence of >a high degree of mental pain and
distress= that [was] >more than mere worry, anxiety,
vexation, embarrassment, or anger.=@  Saenz v. Fid. & Guar. Ins.
Underwriters, 925 S.W.2d 607, 614 (Tex. 1996) (quoting Parkway Co. v.
Woodruff, 901 S.W.2d 434, 444 (Tex. 1995)).  For example, Snyder testified
only that when he got the TWCC‑21, AI was incredulous.  I couldn=t believe it.@  When asked, ABother you when other folks don=t do what they=re supposed to?@ Snyder responded, AYes, a lot.@  

Florence Snyder offered no evidence
of mental anguish other than sadness from being unable to finish a home
renovation after Snyder=s injury.  When Snyder could no longer do the work himself,
the couple had to pay others to do so, and were unable to finish the
renovation.  Mrs. Snyder originally had planned to have a family reunion when
the project was finished, but her sister has since died.  Snyder was questioned
as follows about his reaction to his wife=s experience:

Q:        You=ve
seen your wife today.  You=ve watched how
this has affected her, but how does it affect you having to watch her go
through this, too?

A:        I can handle me.  Mentally, I can.  I can
take a lot.  I don=t - - when she gets hurt, I get furious.  I love her
very much.

Q:        You=ve
got a lot of anger.  Is that all you=ve
got?

A:        No.

Q:        What do you mean?

A:        It makes me very sad what=s happened.

Q:        Quitter?








A:        Trust
people to do what they say they=re going to do and then they don=t.  That=s sad.

In sum, we have found no evidence of
mental anguish that is not based on the assertion that the Adjusters caused
Snyder physical harm and impairment by wrongfully delaying surgery.  Cf.
Killion, 50 S.W.3d at 22.  To the contrary, the record demonstrates that
all of the damages awarded were based on claims outside the trial court=s jurisdiction.

III.  Conclusion

We conclude that Snyder failed to
exhaust administrative remedies, and the trial court has no jurisdiction to
award damages based on the delay or denial of the first preauthorization
request because the TWCC was not asked to determine whether that request was
wrongfully denied.[29]  That
question was waived in the TWCC; thus, the impediment to the trial court=s jurisdiction cannot be removed.[30] 
We therefore sustain the Adjusters= eighth issue, vacate the trial court=s judgment, and dismiss Snyder=s claims with prejudice.[31] 
In light of our disposition of this issue, we do not reach the Adjusters= remaining issues, and Snyder=s cross-appeal is moot.[32]

 

 

 

/s/        Eva M. Guzman

Justice

 

Panel consists of Justices Yates,
Guzman, and Sullivan. 









[1]  Tex. Lab.
Code Ann. ' 407.042 (Vernon 2006).





[2] Id. ' 401.001.





[3]  Snyder also reported the assault to the police.





[4]  Effective September 1, 2005, the administration and
operation of the workers= compensation system became the responsibility of the
Texas Department of Insurance, Division of Workers= Compensation.  Tex.
Lab. Code Ann. ' 402.001 (Vernon 2006).  Because the events in this
case occurred before this reorganization, we refer to the Texas Workers= Compensation Commission (ATWCC@) or Athe Commission@
rather than to the Department of Insurance or the ADivision.@ 

The Commission could require an employee
to submit to a Arequired medical examination@ to resolve any questions about the appropriateness of
the health care received.  Act of May 25, 2001, 77th Leg., R.S., ch. 1456, ' 5.01, 2001 Tex. Gen. Laws 5167, 5181B82 (amended 2005 & 2007) (current version at Tex. Lab. Code Ann. ' 408.004 (Vernon Supp. 2008)).  At the request of an
employee or insurance carrier, including a certified self-insured employer, the
Commission also could order a medical examination by a Adesignated doctor@ to
resolve questions concerning the impairment caused by a compensable injury or
the attainment of maximum medical improvement.  Act of May 25, 2001, 77th Leg.,
R.S., ch. 1456, ' 5.02, 2001 Tex. Gen. Laws 5167, 5182B83 (amended 2005 & 2007) (current version at Tex. Lab. Code Ann. ' 408.0041 (Vernon Supp. 2008)). 





[5]  Specifically, the jury awarded compensatory damages
of $230,000 for past physical pain and suffering, $1.08 million for future
physical pain and suffering, $540,000 for future physical impairment, $119,023
for past loss of earning capacity, $139,776 for future loss of earning
capacity, $100,000 for past mental anguish.  Because it found that their
conduct was committed knowingly, the jury also assessed punitive damages of
$1.8 million against Cunningham Lindsey and $25,000 against Higgins.  Attorneys= fees were also awarded for preparation and trial
($185,000), and contingent attorneys=
fees were awarded in the event of an appeal to an intermediate appellate court
($66,000), for making or responding to a petition for review to the Texas
Supreme Court ($24,000), and for fees that would be incurred if the Texas
Supreme Court granted a petition for review ($24,000).





[6]  Procedures for resolving disputes regarding spinal
surgery begin under chapter 413, but if the dispute  remain unresolved after
consideration by an independent review organization, it proceeds to a contested
case hearing under chapter 410.  Act of May 25, 2001, 77th Leg., R.S., ch.
1456, ' 6.04, 2001 Tex. Gen. Laws 5167, 5187 (now
codified at Tex. Lab. Code Ann. ' 413.031(l) (Vernon Supp. 2008)).





[7]  See 26 Tex. Reg. 9874 (2001) (former 28 Tex. Admin. Code ' 134.600(f)(3)(A), (f)(4)) (Tex. Workers= Comp. Comm=n,
Preauthorization, Concurrent Review, and Voluntary Certification of Health
Care) (requiring a carrier, including a self-insured employer, to communicate
its decision by telephone, fax, or electronically within three working days of
the preauthorization request, and send a written decision within an additional
working day), amended 27 Tex. Reg. 12359 (2002), amended 29 Tex.
Reg. 2349 (2004), amended 31 Tex. Reg. 3566 (2006) (Tex. Dep=t of Ins., Div. of Workers= Comp., Preauthorization, Concurrent Review, and
Voluntary Certification of Health Care).  Requests for preauthorization are
governed by the administrative rules in effect at the time of submission of the
request.  Id. (former 28 Tex.
Admin. Code 134.600(m)); see also 28 Tex. Admin. Code ' 133.308(a)(1)
(2008) (Tex. Dep=t of Ins., Div. of Workers= Comp., MDR by Independent Review Organizations).  We
therefore cite to the provisions of the administrative code in effect in
December 2002, when Snyder initially requested preauthorization.





[8]  See 26 Tex. Reg. 10934 (2001) (former 28 Tex. Admin. Code ' 133.308(e)(2)) (Tex. Workers= Comp. Comm=n,
Medical Dispute Resolution By Independent Review Organizations) (AA person or entity who fails to timely file a request
waives the right to independent review or medical dispute resolution.@), amended 27 Tex. Reg. 12282 (2002), amended
29 Tex. Reg. 8562 (2004); amended 31 Tex. Reg. 10314 (2006) (Tex.
Dep=t of Ins., Div. of Workers= Comp., MDR by Independent Review Organizations), amended
33 Tex. Reg. 3954 (2008).  In accordance with such rules, the Texas Workers= Compensation Commission has repeatedly reversed
decisions holding a carrier responsible for spinal surgery if the claimant
failed to timely file a request for medical dispute resolution after the denial
of preauthorization.  See, e.g., Tex. Workers= Comp. Comm=n,
Appeal No. 042926-s (Jan. 4, 2005) (concluding that even though  medical
necessity of spinal surgery was supported by a preponderance of the evidence,
the carrier was not liable for medical benefits because the claimant did not
timely file a request for medical dispute resolution); Tex. Workers= Comp. Comm=n,
Appeal No. 042573-s (Dec. 6, 2004) (holding that claimant=s failure to request medical dispute resolution within
forty-five days of the carrier=s
preauthorization resulted in waiver of the claimant=s right to medical dispute resolution, and thus, carrier
was not liable for medical benefits for spinal surgery).





[9]  See 26 Tex. Reg. 9874 (2001) (former 28 Tex. Admin. Code ' 134.600(g)(4)) (amended 2002, 2004, & 2006).






[10]  Preauthorization is not required for emergency
surgery, nor did Dr. Esses request preauthorization on an emergency basis. 
Under the Texas Administrative Code,

a medical emergency consists of the sudden onset of a
medical condition manifesting itself by acute symptoms of sufficient severity,
including severe pain, that the absence of immediate medical attention could
reasonably be expected to result in placing the patient=s health and/or bodily functions in serious jeopardy,
and/or serious dysfunction of any body organ or part.

25
Tex. Reg. 2115 (2000) (former 28 Tex.
Admin. Code ' 133.1(a)(7)(A)), (Tex. Workers= Comp. Comm=n,
Definitions for Chapter 133, BenefitsBMedical
Benefits), repealed in part and amended in part 31 Tex. Reg. 3544
(2006) (Tex. Dep=t of Ins., Div. of Workers= Comp., Applicability of Medical Billing and
Processing).  In a letter to Dr. Langeland on the date that Dr. Esses initially
examined Snyder and suggested spinal surgery, he refers to Snyder=s cervical injury and the proposed surgery only as
follows: 

He has neck pain with associated radiation down his
right arm. . . . The examination of his neck, today, shows
limitation of axial rotation to the right and left side.  Axial rotation to the
left produces some right upper extremity complaints.  He has normal motor
strength in both upper extremities. . . . The MRI scan of
the cervical spine shows marked osteophyte formation with disk herniations at
C5-C6 and C6-C7.  I understand that this man has both neck and low back
complaints.  I told him that the neck complaints would be the easiest to
address initially.  I have offered to carry out an anterior C5-C6/C6-C7
diskectomy, decompression, interbody fusion, and peak plate
procedure. . . . He is going to go off and think about
things.  I suggested he may want to talk to you about this.  Once he has
decided to proceed with cervical spine surgery, he will contact my office.  

Dr. Esses did not describe Snyder=s symptoms as severe, and made no mention of Snyder=s prognosis, with or without surgery. 





[11]  Act of May 25, 2001, 77th Leg., R.S., ch. 1456, ' 4.02, 2001 Tex. Gen. Laws 5167, 5180B81 (amended 2003 & 2005) (current version at Tex. Lab. Code Ann. ' 413.014(c)(1) (Vernon 2006)).  





[12]  Id. (current version at Tex. Lab. Code Ann. ' 413.014(d) (Vernon 2006)).





[13]  26 Tex. Reg. 9874 (2001) (former  28 Tex. Admin. Code ' 134.600(b)(1)(B), (e), (h)(3)) (amended 2002, 2004,
& 2006); see also 28 Tex.
Admin. Code ' 133.308(a)(1) (2008).





[14]  26 Tex. Reg. 9874 (2001) (former  28 Tex. Admin. Code ' 134.600(f)(3)(A)) (amended 2002, 2004, & 2006). 
As computed under the Workers= Compensation
Act, a Aworking day@ is
Aany day, Monday-Friday, other than a national holiday
as defined by Texas Government Code, ' 662.003(a)
and the Friday after Thanksgiving Day, December 24th and December 26th.@  24 Tex. Reg. 6488 (1999) (Tex. Workers= Comp. Comm=n,
Computation of Time) (former 28 Tex.
Admin. Code ' 102.3(b)), amended 30 Tex. Reg. 2396 (2005)
(Tex. Dep=t of Ins., Div. of Workers= Comp., Computation of Time).





[15]  26 Tex. Reg. 9874 (2001) (former 28 Tex. Admin. Code ' 134.600(f)(1)(A), (B)) (amended 2002, 2004,
& 2006) (emphasis added).  At trial, Snyder=s expert workers= compensation witness opined that the preauthorization
denial Awas not considered [by the Adjusters] when the
decision was made to go ahead and dispute the claim.@ 





[16]   Id. (former 28 Tex. Admin. Code ' 134.600(f),
(g)(1)).  





[17]  ADay@ means a calendar day.  24 Tex. Reg. 6488 (1999)
(former 28 Tex. Admin. Code ' 102.3(b)) (amended 2005). 





[18]  Act of May 25, 2001, 77th Leg., R.S., ch. 1456, ' 6.04, 2001 Tex. Gen. Laws 5167, 5186B87 (amended 2003, 2005, & 2007) (current version
at Tex. Lab. Code Ann. ' 413.031 (Vernon Supp. 2008)); 26 Tex. Reg. 9874
(2001) (former 28 Tex. Admin. Code ' 134.600(g)(3))(amended 2002, 2004, & 2006);
26 Tex. Reg. 10934 (2001) (former 28 Tex.
Admin. Code ' 133.305) (Tex. Workers= Comp. Comm=n,
Medical Dispute ResolutionBGeneral), amended
27 Tex. Reg. 12282 (2002), amended 31 Tex. Reg. 10314 (2006) (Tex.
Dep=t of Ins., Div. of Workers= Comp., MDRBGeneral),
amended 33 Tex. Reg. 3954 (2008); 26 Tex. Reg. 10934 (2001) (former 28 Tex. Admin. Code ' 133.308(e)(2)) (amended 2002, 2004, 2006, &
2008).





[19]  26 Tex. Reg. 10934 (2001) (former 28 Tex. Admin. Code ' 133.308(o)(5) (amended 2002, 2004, 2006, &
2008)).





[20]  Id. (former 28
Tex. Admin. Code ' 133.308(r)).





[21]  Id. (former 28
Tex. Admin. Code ' 133.308(u)). 





[22]  Cf. Stinson v. Ins. Co. of the State of Pa.,
No. 14-07-00698-CV, 2009 WL 1150100, at *8B11
(Tex. App.CHouston [14th Dist.] Apr. 30, 2009, pet. filed)
(subst. op.).  In Stinson, the trial court granted the workers= compensation insurance carrier=s plea to the jurisdiction asserting failure to
exhaust administrative remedies.  Id.  Because the evidence viewed in
the light most favorable to the non-movant was sufficient to raise a fact issue
as to whether the claimant requested preauthorization, but insufficient to
establish that the request was denied in writing as required, we reversed and
remanded.  Id.  This case, in contrast, presents a post-trial
jurisdictional challenge subject to a de novo standard of review, and the
record here contains both the request and its timely denial.





[23]  Id. (former 28
Tex. Admin. Code ' 133.308(f)(7)).





[24]  26 Tex. Reg. 9874 (2001) (former 28 Tex. Admin. Code ' 134.600(b)) (amended 2002, 2004, & 2006)
(emphasis added). 





[25]  Act of May 31, 2003, 78th Leg., R.S., ch. 980, '3, 2003 Tex. Gen. Laws 2864, 2865 (eff. Sept. 1,
2003).  The language at issue was originally added to subsection (e), see Act
of May 31, 2003, 78th Leg., R.S., ch. 980, ' 1,
2003 Tex. Gen. Laws 2864, 2864, but was moved to subsection (f) in 2005.  See
Act of May 29, 2005, 79th Leg., R.S., ch. 265, ' 3.236, 2005 Tex. Gen. Laws 469, 550.





[26]  Although Snyder argues that Texas Mutual
Insurance Co. v. Ruttiger, 265 S.W.3d at 651, is on point, we find it
readily distinguishable.  In Ruttiger, the claimant and carrier entered
into a Benefit Dispute Agreement in which they agreed that Ruttiger sustained a
compensable injury in the form of a hernia and suffered a disability for a
specific period of time.  Id. at 656.  After entering into the
agreement, the carrier Apaid Ruttiger income and impairment benefits, Ruttiger
received surgery for his injuries, and Ruttiger received all the benefits that
he was entitled to receive under the Benefit Dispute Agreement.@  Id. at 656 n.4.  Ruttiger subsequently sued the
carrier for Afail[ure]ed to timely pay the benefits that it had
agreed to pay.@  Id. at 656 (emphasis added).  The First Court
of Appeals held that the Benefit Dispute Agreement constituted Aa final determination that benefits were due to
Ruttinger@; therefore, Ruttiger was not required to pursue the
compensability dispute through all four tiers of administrative proceedings.  Id.
at 657B58.  Moreover, the court emphasized that Athere is no suggestion in the record that, following
the parties= entry into the Benefit Dispute Agreement, any dispute
remained regarding what specific benefits Ruttiger was entitled to recover.@  Id. at 658 n.8.  In contrast, there is no
agreement here that Snyder=s spinal
surgery was medically necessary in December 2002.





[27]  Voir dire by Snyder=s counsel.





[28]  Closing argument by Snyder=s counsel.





[29]  See Malish v. Pac. Employers Ins. Co., 106
S.W.3d 744, 746 (Tex. App.CFort Worth
2003, no pet.) (citing Fodge, 63 S.W.3d at 803).  





[30]  See Fodge, 63 S.W.3d at 805. 





[31]  See State ex rel. Latty v. Owens, 907 S.W.2d
484, 486 (Tex. 1995) (per curiam).





[32]  See In re H&R Block Fin. Advisors, Inc.,
262 S.W.3d 896, 900 (Tex. App.CHouston [14th
Dist.] 2008, orig. proceeding) (explaining mootness doctrine).