**CUNNINGHAM LINDSEY CLAIMS MANAGEMENT, INC. and Glenda Higgins, Appellants,**

v.

**Lloyd SNYDER, Appellee.**

**No. 14–07–00449–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

June 25, 2009.

Rehearing Overruled Sept. 3, 2009.

Geoffrey H. Bracken, Kristopher M. Stockberger, Stacy R. Obenhaus, John G.H. Davis, G. Byron Sims, Houston, for appellants.

Byron C. Keeling, Michael P. Doyle, Wade R. Quinn, Houston, for appellee.

Panel consists of Justices YATES, GUZMAN, and SULLIVAN.

## OPINION

EVA M. GUZMAN, Justice.

In the dispositive question presented in this appeal, we are asked whether the trial court had jurisdiction to award damages to a workers' compensation claimant based on the conduct of the appellants, a third-party adjuster and the adjuster's employer, in allegedly delaying the claimant's spinal surgery. When preauthorization for the surgery was initially requested, it was denied as medically unnecessary. Because the claimant did not challenge this determination, he failed to exhaust administrative remedies; thus, the trial court lacked jurisdiction over the claimant's contention—on which all of his claims are based—that he needed surgery at that time. Moreover, the impediment to jurisdiction cannot be removed because the claimant has waived the right to challenge the denial of medical necessity. We therefore vacate the judgment and dismiss the case with prejudice.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellee Lloyd Snyder was employed as a psychiatric nurse by Christus Health Gulf Coast d/b/a Christus St. Joseph Hospital ("Christus"), a certified self-insured employer [1] under the Texas Workers'

Compensation Act.[2] On October 9, 2002, a patient punched Snyder on his right collarbone. Snyder sought medical care from an emergency room within a day, and on October 14, 2002, he visited his primary care physician, Dr. Patrick Wills.[3] Christus referred the claim to appellant Cunningham Lindsey Claims Management, Inc., an independent adjusting firm ("Cunningham Lindsey"), and the claim was assigned to adjuster Glenda Higgins ("Higgins"). We refer to Cunningham Lindsey and Higgins collectively as the "Adjusters."

Snyder retained the Ogletree Law Firm to represent him regarding this injury and changed his treating physician to receive chiropractic care from William Langeland, D.C., and medication from Pete Nguyen, M.D. Snyder returned to work on October 21, 2002, but within approximately two days, he experienced such pain that he ceased further attempts to work.

Dr. Langeland recommended magnetic resonance imaging (an "MRI"), which was performed on November 20, 2002, and nerve conduction and needle EMG studies were performed on December 2, 2002. Dr. Langeland then referred Snyder to an orthopaedic surgeon, Dr. Stephen Esses, for evaluation of Snyder's neck and back pain. In the meantime, Higgins requested additional examinations, including a required medical exam and a designated doctor review.[4]

---

1. TEX. LAB.CODE ANN. § 407.042 (Vernon 2006).

2. *Id.* § 401.001.

3. Snyder also reported the assault to the police.

4. Effective September 1, 2005, the administration and operation of the workers' compensation system became the responsibility of the Texas Department of Insurance, Division of Workers' Compensation. TEX LAB.CODE ANN. § 402.001 (Vernon 2006). Because the

events in this case occurred before this reorganization, we refer to the Texas Workers' Compensation Commission ("TWCC") or "the Commission" rather than to the Department of Insurance or the "Division."

The Commission could require an employee to submit to a "required medical examination" to resolve any questions about the appropriateness of the health care received. Act of May 25, 2001, 77th Leg., R.S., ch. 1456, § 5.01, 2001 Tex. Gen. Laws 5167, 5181–82 (amended 2005 & 2007) (current version at TEX LAB.CODE ANN. § 408.004 (Vernon Supp.

## A.  First Preauthorization Request

On Thursday, December 19, 2002, Dr. Esses requested preauthorization from Genex Services, Inc. ("Genex") to perform spinal surgery.  Genex, the preauthorization agent assigned to evaluate the request, denied preauthorization on the ground that the surgery described was not medically necessary.  Snyder did not timely request reconsideration or dispute the denial.

## B.  Compensability Dispute

On December 26, 2002, Higgins sent Snyder a copy of a completed Texas Workers' Compensation Commission ("TWCC") form known as a TWCC–21, entitled "Payment of Compensation or Notice of Refused/Disputed Claim."  On the first page, Higgins certified that "benefits will be paid as accrued," but also noted that payment was "refused or disputed" for a variety of reasons, some of which were later admitted to be inapplicable.  As relevant to the arguments presented in this appeal, Higgins disputed the compensability and extent of injury, if any.  She also stated that the MRI results did not support a need for surgery, and "[t]he injury was not such which would cause a need for any surgery to the neck or back."  Cunningham Lindsey closed its Houston office on January 24, 2003, ending Higgins's employment.  Thereafter, Snyder's claim was handled by adjusters in other Cunningham Lindsey offices as Snyder challenged the Adjusters' conclusions about the compensability and extent of his injury.

A benefit review conference held on September 12, 2003 resulted in recommen-dations favoring Snyder, and Christus requested a contested case hearing.  On November 6, 2003, the hearing officer issued a decision and order in which she concluded that Christus waived its right to contest compensability by failing to dispute or pay benefits within seven days.  She further concluded that Snyder was injured in the course and scope of his employment and found that his injury "extends to and includes an aggravation of the cervical area" at C5–C6 and C6–C7 "and osteophytes associated with these levels."  Christus therefore was "ordered to pay medical and income benefits in accordance with [the] decision, the Texas Workers' Compensation Act and the [TWCC]'s Rules."  Each of these findings and conclusions was consistent with the prior recommendations of the benefit review officer.

Christus appealed the hearing officer's conclusions regarding waiver and extent of injury, but did not challenge the independent finding of compensability.  The hearing officer's decision was affirmed on February 4, 2004.

## C.  Second Preauthorization Request

More than two months later, a second request was made on April 14, 2004 for preauthorization to perform an anterior C5–C6, C6–C7 discectomy, interbody fusion and plate.  Genex approved the request within a day, and the surgery was performed on April 27, 2004.

## D.  This Lawsuit

Five months after his cervical surgery, Snyder sued Christus and the Adjusters for violations of former article 21.21 of the

2008)).  At the request of an employee or insurance carrier, including a certified self-insured employer, the Commission also could order a medical examination by a "designated doctor" to resolve questions concerning the impairment caused by a compensable injury or the attainment of maximum medical improvement.  Act of May 25, 2001, 77th Leg., R.S., ch. 1456, § 5.02, 2001 Tex. Gen. Laws 5167, 5182–83 (amended 2005 & 2007) (current version at Tex. Lab Code Ann. § 408.0041 (Vernon Supp. 2008)).

Insurance Code and the Deceptive Trade Practices–Consumer Protection Act ("DTPA"). Christus settled before trial, and a jury found that (1) the Adjusters engaged in unfair and deceptive acts or practices that were a producing cause of damages to Snyder, (2) Cunningham Lindsey engaged in an unconscionable action or course of action that was a producing cause of damages to Snyder, and (3) both Cunningham Lindsey and Higgins acted knowingly. Finally, the jury assessed actual and punitive damages totaling $2,208,799, including $540,000 for future impairment.[5] The trial court suggested a remittitur of the jury's entire award of damages for future physical impairment, and Snyder agreed; thus, the jury's award of total damages in the amount of $2,208,799 was reduced by the settlement credit of $208,133.64 and remittitur of $540,000, for a total award of $1,460,665.36 for actual damages, in addition to attorneys' fees and costs. Both Snyder and the Adjusters appeal.

## II. ISSUES PRESENTED

The Adjusters present nine issues for review, and Snyder presents a single cross-issue. The Adjusters direct their first three issues to jury Question No. One, which largely tracks language from former article 21.21 of the Texas Insurance Code. They base their arguments on the undisputed fact that Christus is self-insured, and thus, no insurance policy is involved in the case. In their first issue, they point out that former article 21.21 of the Texas

Insurance Code prohibits deceptive acts or practices "in the business of insurance," and they contend that because they administered Christus's self-funded workers' compensation plan, they were not engaged in the "business of insurance." They argue in their second issue that the same jury question contains an invalid theory of liability because it allows the jury to find that the Adjusters made a misrepresentation of "self-insured insurance coverage." They assert that the phrase "self-insured insurance" is an oxymoron that is not encompassed within former article 21.21 of the Insurance Code, and thus, the trial court erred in submitting the question or in failing to disregard the jury's answer as immaterial. In their third issue, the Adjusters challenge the legal sufficiency of the evidence to support the jury's answer to the same question.

In their fourth issue, the Adjusters shift their focus to Snyder's DTPA theory of liability. They contend that Snyder is not a bona fide "consumer" and therefore was not entitled to submit a DTPA-based theory to the jury. In their fifth issue, the Adjusters challenge the submission of a jury question on unconscionability, arguing that Snyder did not allege in his presubmission pleadings that the Adjusters' conduct was unconscionable, and the trial court abused its discretion in allowing a post-verdict amendment to add the claim. They contend in their sixth issue that the evidence is legally insufficient to support the finding that Cunningham Lindsey's

---

5. Specifically, the jury awarded compensatory damages of $230,000 for past physical pain and suffering, $1.08 million for future physical pain and suffering, $540,000 for future physical impairment, $119,023 for past loss of earning capacity, $139,776 for future loss of earning capacity, $100,000 for past mental anguish. Because it found that their conduct was committed knowingly, the jury also assessed punitive damages of $1.8 million

against Cunningham Lindsey and $25,000 against Higgins. Attorneys' fees were also awarded for preparation and trial ($185,000), and contingent attorneys' fees were awarded in the event of an appeal to an intermediate appellate court ($66,000), for making or responding to a petition for review to the Texas Supreme Court ($24,000), and for fees that would be incurred if the Texas Supreme Court granted a petition for review ($24,000).

conduct, considered separately from Higgins's conduct, was unconscionable. In their seventh issue, the Adjusters assert that they owed Snyder no legally cognizable duty.

The Adjusters raise a challenge to the trial court's jurisdiction in their eighth issue. Specifically, they contend that the trial court lacked jurisdiction to award damages based on the alleged delay in Snyder's spinal surgery because the TWCC never required Christus to pay for the operation. In their ninth issue, the Adjusters assert that the only damage claim Snyder submitted that was independent of his work-related injury was a claim for damage to his credit reputation. The Adjusters argue that because the jury failed to find this type of damage, the trial court erred in refusing to render judgment that Snyder take nothing.

In his only cross-issue, Snyder contends the trial court erred in suggesting remittitur of all damages assessed by the jury for future physical impairment.

### III. ANALYSIS

#### A. Standard of Review

■■■ We begin, as we must, with the jurisdictional challenge presented in the Adjusters' eighth issue. The trial court has jurisdiction to award damages only to the extent that relief is not dependent upon the adjudication, directly or indirectly, of a matter within the TWCC's exclusive jurisdiction. *Cigna Ins. Co. of Tex. v. Killion,* 50 S.W.3d 17, 22 (Tex.App.-Amarillo 2001, pet. denied), *judgment corrected on reh'g,* 2001 WL 617512 (Tex.App.-Amarillo June 6, 2001) (per curiam, not designated for publication) (correcting assessment of costs). The determination that an agency does nor does not have exclusive jurisdiction is a question of law which we review de novo. *Subaru of Am., Inc. v. David McDavid Nissan, Inc.,* 84 S.W.3d 212, 222 (Tex.2002) (op. on reh'g). If an agency has exclusive jurisdiction to resolve a dispute, a party must first exhaust all administrative remedies before a trial court has subject matter jurisdiction. *O'Neal v. Ector County Indep. Sch. Dist.,* 251 S.W.3d 50, 51 (Tex.2008) (per curiam) (citing *In re Sw. Bell Tel. Co., L.P.,* 235 S.W.3d 619, 624–25 (Tex.2007) (orig. proceeding)).

#### B. Types of Dispute Resolution

■■ There are two general types of dispute resolution under the Workers' Compensation Act: disputes regarding compensability and extent of injury are addressed by proceedings pursuant to chapter 410 of the Labor Code, but disputes regarding medical necessity or preauthorization for particular treatments follow a separate procedure instituted under chapter 413.[6] The requirement to exhaust administrative remedies applies to each type of dispute. *See Pickett v. Tex. Mut. Ins. Co.,* 239 S.W.3d 826, 831 (Tex. App.-Austin 2007, no pet.) (affirming dismissal of claims concerning alleged delay of medical treatment and benefits because benefit dispute agreement that resolved issues of causation, relatedness, and compensability did not address specific treatments or benefits required). If both types of dispute are present, a claimant may exhaust administrative remedies applicable to one but fail to exhaust administrative remedies regarding the other. *Cf.*

---

6. Procedures for resolving disputes regarding spinal surgery begin under chapter 413, but if the dispute remain unresolved after consideration by an independent review organization, it proceeds to a contested case hearing under chapter 410. Act of May 25, 2001, 77th Leg., R.S., ch. 1456, § 6.04, 2001 Tex. Gen. Laws 5167, 5187 (now codified at TEX LAB.CODE ANN. § 413.031(*l*) (Vernon Supp. 2008)).

*id.* Thus, to determine whether a party has exhausted administrative remedies, we must compare the disputes raised in the trial court with those raised or resolved in the administrative agency. *See, e.g., Tex. Mut. Ins. Co. v. Ruttiger,* 265 S.W.3d 651 (Tex.App.-Houston [1st Dist.] 2008, pet. filed) (comparing allegations made in the trial court with the content of benefit dispute agreement and concluding that claimant exhausted administrative remedies regarding matters addressed in the Agreement); *Pickett,* 239 S.W.3d at 837 (contrasting allegations made in the trial court with content of a benefit dispute agreement and concluding that claimant failed to exhaust administrative remedies regarding claims that were *not* addressed in the agreement).

Snyder contends that his claims against the Adjusters arise solely from a dispute about whether he sustained a compensable injury. He asserts that he required surgery to his cervical spine in December 2002, but the Adjusters wrongfully challenged compensability. According to Snyder, he could not institute medical dispute resolution until the compensability dispute was resolved, and he reasons that the compensability dispute effectively and wrongfully delayed his surgery for more than sixteen months. He contends that this delay caused him permanent damage and impairment, including chronic pain syndrome, that is independent from his work-related injury.

█ Although Snyder characterizes his injuries as the result of a wrongful compensability dispute for which he has exhausted his administrative remedies, his claims are dependent on the determination that he was entitled to preauthorization of the surgery in December 2002. *See Am. Motorists Ins. Co. v. Fodge,* 63 S.W.3d 801, 804 (Tex.2001) (concluding that the workers' compensation process "precludes bad faith liability for denying benefits to which the claimant is not entitled"); *Macias v. Schwedler,* 135 S.W.3d 826, 830 (Tex.App.-Houston [1st Dist.] 2004, pet. denied) (dismissing bad-faith insurance claims against carriers and claims administrators because, although plaintiff did not seek compensation benefits at trial, "the basis for the denial of benefits [was] central to the lawsuit" and only TWCC could decide that treatment was wrongfully refused). Only two entities could determine the medical necessity of the surgery. Christus, acting through the Adjusters or Genex, could have simply preauthorized the surgery when it was initially requested, thereby waiving a later dispute about medical necessity.[7] This did not happen. Because preauthorization was denied on the asserted basis of lack of medical necessity, Snyder's only recourse was to obtain a ruling on medical necessity from the TWCC by following the procedure set forth in the

---

7. *See* 26 Tex. Reg. 9874 (2001) (former 28 TEX. ADMIN. CODE § 134.600(f)(3)(A), (f)(4)) (Tex. Workers' Comp. Comm'n, Preauthorization, Concurrent Review, and Voluntary Certification of Health Care) (requiring a carrier, including a self-insured employer, to communicate its decision by telephone, fax, or electronically within three working days of the preauthorization request, and send a written decision within an additional working day), *amended* 27 Tex. Reg. 12359 (2002), *amended* 29 Tex. Reg. 2349 (2004), *amended* 31 Tex. Reg. 3566 (2006) (Tex. Dep't of Ins., Div. of Workers' Comp., Preauthorization, Concurrent Review, and Voluntary Certification of Health Care). Requests for preauthorization are governed by the administrative rules in effect at the time of submission of the request. *Id.* (former 28 TEX ADMIN. CODE 134.600(m)); *see also* 28 TEX ADMIN. CODE § 133.308(a)(1) (2008) (Tex. Dep't of Ins., Div. of Workers' Comp., MDR by Independent Review Organizations). We therefore cite to the provisions of the administrative code in effect in December 2002, when Snyder initially requested preauthorization.

Texas Administrative Code for challenging the denial. Because Snyder did not do so, he waived the argument that spinal surgery was medically necessary in December 2002.[8] Thereafter, no additional requests for preauthorization of the same surgery could be submitted unless there was a substantial change in Snyder's medical condition.[9] This, however, is apparently what happened here. After Snyder's condition worsened, a second preauthorization request was submitted on April 14, 2004 and granted on April 15, 2004. With regard to the second preauthorization request, it is undisputed that the spinal surgery was medically necessary at that time, and it was authorized without delay. But the absence of a dispute regarding the second preauthorization request does not alter the fact that, under the governing statutes and administrative rules, resolution of any question regarding the need for surgery in December 2002 rested exclusively with the TWCC. *See Fodge*, 63 S.W.3d at 804.

After comparing those provisions to the facts of this case, we conclude that Snyder failed to exhaust his administrative remedies.

## C. Medical Dispute Resolution Procedures

The Texas Workers' Compensation Act and the Administrative Code dictate the procedure for establishing medical necessity and define the point in time when a carrier is liable for the cost of spinal surgery. *See* Act of May 25, 2001, 77th Leg. R.S., ch. 1456, § 4.01, 2001 Tex. Gen. Laws 5167, 5180 ("Except in a medical emergency,[10] an insurance carrier is liable for medical costs related to spinal surgery *only as*

8. *See* 26 Tex. Reg. 10934 (2001) (former 28 Tex. Admin. Code § 133.308(e)(2)) (Tex. Workers' Comp. Comm'n, Medical Dispute Resolution By Independent Review Organizations) ("A person or entity who fails to timely file a request waives the right to independent review or medical dispute resolution."), *amended* 27 Tex. Reg. 12282 (2002), *amended* 29 Tex. Reg. 8562 (2004); *amended* 31 Tex. Reg. 10314 (2006) (Tex. Dep't of Ins., Div. of Workers' Comp., MDR by Independent Review Organizations), *amended* 33 Tex. Reg. 3954 (2008). In accordance with such rules, the Texas Workers' Compensation Commission has repeatedly reversed decisions holding a carrier responsible for spinal surgery if the claimant failed to timely file a request for medical dispute resolution after the denial of preauthorization. *See, e.g.*, Tex. Workers' Comp. Comm'n, Appeal No. 042926-s (Jan. 4, 2005) (concluding that even though medical necessity of spinal surgery was supported by a preponderance of the evidence, the carrier was not liable for medical benefits because the claimant did not timely file a request for medical dispute resolution); Tex. Workers' Comp. Comm'n, Appeal No. 042573-s (Dec. 6, 2004) (holding that claimant's failure to request medical dispute resolution within forty-five days of the carrier's preauthorization resulted in waiver of the claimant's right to medical dispute resolution, and thus, carrier was not liable for medical benefits for spinal surgery).

9. *See* 26 Tex. Reg. 9874 (2001) (former 28 Tex. Admin. Code § 134.600(g)(4)) (amended 2002, 2004, & 2006).

10. Preauthorization is not required for emergency surgery, nor did Dr. Esses request preauthorization on an emergency basis. Under the Texas Administrative Code,

a medical emergency consists of the sudden onset of a medical condition manifesting itself by acute symptoms of sufficient severity, including severe pain, that the absence of immediate medical attention could reasonably be expected to result in placing the patient's health and/or bodily functions in serious jeopardy, and/or serious dysfunction of any body organ or part.

25 Tex. Reg. 2115 (2000) (former 28 Tex. Admin. Code § 133.1(a)(7)(A)), (Tex. Workers' Comp. Comm'n, Definitions for Chapter 133, Benefits–Medical Benefits), *repealed in part and amended in part* 31 Tex. Reg. 3544 (2006) (Tex. Dep't of Ins., Div. of Workers' Comp., Applicability of Medical Billing and Processing). In a letter to Dr. Langeland on the date that Dr. Esses initially examined Snyder and

*provided by Section 413.014 and commission rules."*) (emphasis added) (amended 2005) (current version at Tex. Lab.Code Ann. § 408.026 (Vernon 2006)). Pursuant to section 413.004, TWCC rules were required to provide that preauthorization is required for spinal surgery.[11] Unless otherwise agreed, "[t]he insurance carrier is not liable for those specified treatments and services requiring preauthorization unless preauthorization is sought by the claimant or health care provider and either obtained from the insurance carrier or ordered by the commission." [12]

In December 2002, the determination that a workers' compensation claimant with a compensable spinal injury was entitled to non-emergency spinal surgery involved the following steps:

> suggested spinal surgery, he refers to Snyder's cervical injury and the proposed surgery only as follows:
>> He has neck pain with associated radiation down his right arm.... The examination of his neck, today, shows limitation of axial rotation to the right and left side. Axial rotation to the left produces some right upper extremity complaints. He has normal motor strength in both upper extremities.... The MRI scan of the cervical spine shows marked osteophyte formation with disk herniations at C5–C6 and C6–C7. I understand that this man has both neck and low back complaints. I told him that the neck complaints would be the easiest to address initially. I have offered to carry out an anterior C5–C6/C6–C7 diskectomy, decompression, interbody fusion, and peak plate procedure.... He is going to go off and think about things. I suggested he may want to talk to you about this. Once he has decided to proceed with cervical spine surgery, he will contact my office.
>
> Dr. Esses did not describe Snyder's symptoms as severe, and made no mention of Snyder's prognosis, with or without surgery.

11. Act of May 25, 2001, 77th Leg., R.S., ch. 1456, § 4.02, 2001 Tex. Gen. Laws 5167, 5180–81 (amended 2003 & 2005) (current version at Tex. Lab.Code Ann. § 413.014(c)(1) (Vernon 2006)).

1. First, a claimant or health care provider had to request preauthorization for spinal surgery.[13]

2. The carrier (or in this case, the self-insured employer or its agents) then had three working days to approve or deny the request for preauthorization.[14] The decision was required to be "based solely upon the reasonable and necessary medical health care required to treat the injury, *regardless of:* (A) *unresolved issues of compensability,* extent of or relatedness to the compensable injury; [or] (B) the carrier's liability for the injury...." [15]

3. If the request was timely denied, then within fifteen working days of receipt of the written denial, the claimant

12. *Id.* (current version at Tex. Lab.Code Ann § 413.014(d) (Vernon 2006)).

13. 26 Tex. Reg. 9874 (2001) (former 28 Tex. Admin. Code § 134.600(b)(1)(B), (e), (h)(3)) (amended 2002, 2004, & 2006); *see also* 28 Tex. Admin. Code § 133.308(a)(1) (2008).

14. 26 Tex. Reg. 9874 (2001) (former 28 Tex. Admin Code § 134.600(f)(3)(A)) (amended 2002, 2004, & 2006). As computed under the Workers' Compensation Act, a "working day" is "any day, Monday–Friday, other than a national holiday as defined by Texas Government Code, § 662.003(a) and the Friday after Thanksgiving Day, December 24th and December 26th." 24 Tex. Reg. 6488 (1999) (Tex. Workers' Comp. Comm'n, Computation of Time) (former 28 Tex. Admin. Code § 102.3(b)), *amended* 30 Tex. Reg. 2396 (2005) (Tex. Dep't of Ins., Div. of Workers' Comp., Computation of Time).

15. 26 Tex. Reg. 9874 (2001) (former 28 Tex. Admin Code § 134.600(f)(1)(A), (B)) (amended 2002, 2004, & 2006) (emphasis added). At trial, Snyder's expert workers' compensation witness opined that the preauthorization denial "was not considered [by the Adjusters] when the decision was made to go ahead and dispute the claim."

could request reconsideration of the preauthorization request.[16]

4. If the request for reconsideration also was denied, then the claimant had forty-five days[17] to challenge the denial by filing a request for Medical Dispute Resolution by an independent review organization ("IRO").[18] An IRO decision is deemed to be a commission decision and order,[19] and "[i]t is a defense for the carrier if the carrier timely complies with the IRO decision with respect to the medical necessity or appropriateness of health care for an injured employee."[20]

5. A party to a medical necessity dispute regarding spinal surgery could appeal the IRO decision by requesting a Contested Case hearing ("CCH").[21]

Here, the jurisdictional evidence shows that only the first two steps occurred. The parties do not dispute that Dr. Esses requested preauthorization on December 19, 2002, and the evidence is similarly uncontroverted that the request was timely denied for the sole stated reason that such surgery was not medically necessary.[22] There is no evidence, however, that Snyder, his counsel, or any of his health care providers requested reconsideration of the denial or initiated medical dispute resolution. Consequently, the denial of the requested preauthorization was allowed to stand unchallenged.

Although a request for an IRO would have been held in abeyance until the dispute regarding compensability and extent of injury were resolved by a final decision of the Commission,[23] a timely IRO request still was required. *See Schwartz v. Ins. Co. of State of Pa.*, 274 S.W.3d 270, 275 n. 7 (Tex.App.-Houston [1st Dist.] 2008, pet. denied) ("[T]imely resolution of medical necessity disputes is also public policy, and the administrative steps available to resolve such disputes are guided by manda-

**16.** *Id.* (former 28 TEX. ADMIN. CODE § 134.600(f), (g)(1)).

**17.** "Day" means a calendar day. 24 Tex. Reg. 6488 (1999) (former 28 TEX. ADMIN. CODE § 102.3(b)) (amended 2005).

**18.** Act of May 25, 2001, 77th Leg., R.S., ch. 1456, § 6.04, 2001 Tex. Gen. Laws 5167, 5186–87 (amended 2003, 2005, & 2007) (current version at TEX. LAB.CODE ANN. § 413.031 (Vernon Supp. 2008)); 26 Tex. Reg. 9874 (2001) (former 28 TEX. ADMIN. CODE § 134.600(g)(3))(amended 2002, 2004, & 2006); 26 Tex. Reg. 10934 (2001) (former 28 TEX. ADMIN. CODE § 133.305) (Tex. Workers' Comp. Comm'n, Medical Dispute Resolution–General), *amended* 27 Tex. Reg. 12282 (2002), *amended* 31 Tex. Reg. 10314 (2006) (Tex. Dep't of Ins., Div. of Workers' Comp., MDR–General), *amended* 33 Tex. Reg. 3954 (2008); 26 Tex. Reg. 10934 (2001) (former 28 TEX. ADMIN. CODE § 133.308(e)(2)) (amended 2002, 2004, 2006, & 2008).

**19.** 26 Tex. Reg. 10934 (2001) (former 28 TEX. ADMIN. CODE § 133.308(*o* )(5) (amended 2002, 2004, 2006, & 2008)).

**20.** *Id.* (former 28 TEX ADMIN. CODE § 133.308(r)).

**21.** *Id.* (former 28 TEX. ADMIN. CODE § 133.308(u)).

**22.** *Cf. Stinson v. Ins. Co. of the State of Pa.*, 286 S.W.3d 77, 87–90 (Tex.App.-Houston [14th Dist.] 2009, pet. filed) (subst. op.). In *Stinson*, the trial court granted the workers' compensation insurance carrier's plea to the jurisdiction asserting failure to exhaust administrative remedies. *Id.* Because the evidence viewed in the light most favorable to the non-movant was sufficient to raise a fact issue as to whether the claimant requested preauthorization, but insufficient to establish that the request was denied in writing as required, we reversed and remanded. *Id.* This case, in contrast, presents a post-trial jurisdictional challenge subject to a de novo standard of review, and the record here contains both the request and its timely denial.

**23.** *Id.* (former 28 TEX. ADMIN. CODE § 133.308(f)(7)).

tory time requirements ....") (citing 28 Tex. Admin. Code Ann. §§ 133.305, 133.308, 134.600 (2008)). Moreover, no similar provision extended the time to request reconsideration.

Here, no request for reconsideration or medical dispute resolution was filed at any time. Instead, Snyder and his healthcare providers filed a second request for preauthorization more than five months after the compensability dispute ended and 71 days after a final decision was rendered regarding the extent of injury.

Our conclusion that Snyder failed to exhaust administrative remedies also is supported by the governing administrative rule that specifies the time when the carrier or self-insured employer would have become liable for the costs of spinal surgery:

> The insurance carrier is liable for all reasonable and necessary medical costs relating to the health care required to treat a compensable injury:
>
> (1) listed in subsection (h) ... of this section, [which includes spinal surgery,] *only when* the following situations occur:
>
> (A) an emergency, as defined in § 133.1 of this title (relating to Definitions);
>
> (B) preauthorization of [spinal surgery] was approved prior to providing the health care;
>
> . . .
>
> (D) when ordered by the commission.... [24]

None of these events occurred before the second request for preauthorization was approved on April 15, 2004.

## D. Existence of a Medical–Necessity Dispute

■ Snyder asserts that medical necessity was not in dispute, and instead focuses his argument on evidence of the following facts: (1) Dr. Esses requested preauthorization for cervical surgery on December 19, 2002; (2) the Adjusters contested compensability; (3) the compensability dispute was ultimately resolved in Snyder's favor; (4) Snyder's condition worsened between December 19, 2002 and April 15, 2004; and (5) Genex authorized surgery on April 15, 2004. Significantly, he fails to mention on appeal that there were *two* requests to preauthorize surgery, and the first was denied as medically unnecessary. By overlooking Genex's determination that surgery was not medically necessary in 2002 and the second request for preauthorization in 2004, Snyder argues that the Adjusters responded to the 2002 request for preauthorization by denying compensability and ultimately preauthorized the surgery in 2004 *as the result of* the resolution of the compensability dispute in Snyder's favor. As a matter of law, however, the procedures for raising and resolving disputes about compensability and medical necessity are and remain separate.

Snyder further argues that he was not required to comply with medical-dispute resolution procedures because (1) cervical surgery was eventually preauthorized; thus, any dispute about its necessity is barred; (2) at the time Snyder filed suit, there was no unresolved dispute over the necessity of Snyder's cervical surgery; (3) the TWCC does not provide a review process for matters that are not in dispute; (4) under Texas case law, an insured need not "exhaust remedies" as to matters that are not in dispute and for which no remedy

24. 26 Tex. Reg. 9874 (2001) (former 28 Tex Admin. Code § 134.600(b)) (amended 2002, 2004, & 2006) (emphasis added).

exists; and (5) resolution of his claims did not require the trial court to resolve an issue that lies exclusively within the jurisdiction of an administrative agency. Each of these arguments is based on at least one false premise.

Concerning the first of these arguments, Snyder states:

> Not only was there no dispute about the preauthorization of Snyder's surgery, but the preauthorization *permanently barred* any future dispute about its necessity. *See* TEX. LAB.CODE ANN. § 413.014(f) (Vernon Supp. 2007) ("The insurance carrier is liable for health care treatment and treatment plans and pharmaceutical services that are voluntarily preauthorized and may not dispute the certified or agreed-on preauthorized health care treatment and treatment plans and pharmaceutical services at a later date."). Thus, even if Snyder had sought to obtain a ruling on preauthorization when the dispute no longer existed, Section 413.014(f) statutorily barred Appellants from contesting their preauthorization.

We do not reach the merits of this argument because this provision is inapplicable as a matter of law. The language of Labor Code section 413.014(f) on which Snyder relies was enacted the year *after* the first request for preauthorization, and by its terms applies only to requests for "voluntary precertification" occurring on, or after, September 1, 2003.[25] Thus, even if requests for "voluntary precertification" and for preauthorization are the same—a question we do not reach—the statute would apply only to the request that was granted in 2004 (and for which medical necessity is not disputed), but would not apply to the request that was denied in 2002 (and for which any challenge to the lack of medical necessity is waived). Moreover, " '[t]he fact that the . . . surgery w[as] ultimately authorized does not constitute any type of determination by the Commission that the initial denial . . . [was] improper.' " *Schwartz*, 274 S.W.3d at 274 (quoting *In re Tex. Mut. Ins. Co.*, No. 05–05–00944–CV, 2005 WL 1763562, at *2 (Tex.App.-Dallas July 27, 2005, orig. proceeding) (mem. op.)).

As to Snyder's second, third, and fourth arguments, it is true that there was no unresolved medical necessity dispute by the time he filed this suit; however, this fact is not dispositive of the jurisdictional issue. Here, the reason there is no unresolved dispute is because Snyder waived the right to dispute Genex's determination that surgery was not medically necessary in 2002. Having waived that contention in the TWCC, he cannot now litigate it in district court; his claim for damages for delayed surgery "is made no more viable simply by restating it under the other legal theories" of bad faith or statutory violations. *See Fodge*, 63 S.W.3d at 804.[26]

---

25. Act of May 31, 2003, 78th Leg., R.S., ch. 980, § 3, 2003 Tex. Gen. Laws 2864, 2865 (eff. Sept. 1, 2003). The language at issue was originally added to subsection (e), *see* Act of May 31, 2003, 78th Leg., R.S., ch. 980, § 1, 2003 Tex. Gen. Laws 2864, 2864, but was moved to subsection (f) in 2005. *See* Act of May 29, 2005, 79th Leg., R.S., ch. 265, § 3.236, 2005 Tex. Gen. Laws 469, 550.

26. Although Snyder argues that *Texas Mutual Insurance Co. v. Ruttiger*, 265 S.W.3d at 651, is on point, we find it readily distinguishable.

In *Ruttiger*, the claimant and carrier entered into a Benefit Dispute Agreement in which they agreed that Ruttiger sustained a compensable injury in the form of a hernia and suffered a disability for a specific period of time. *Id.* at 656. After entering into the agreement, the carrier "paid Ruttiger income and impairment benefits, Ruttiger received surgery for his injuries, and Ruttiger received all the benefits that he was entitled to receive under the Benefit Dispute Agreement." *Id.* at 656 n. 4. Ruttiger subsequently sued the carrier for "fail[ure] to timely pay the benefits *that it had*

Stated differently, the question of whether the first preauthorization was wrongfully denied—and hence, whether Snyder was damaged by a wrongful delay—can be answered only by first determining whether spinal surgery was medically necessary in December 2002. That question was answered by Genex in the negative, and because Snyder failed to timely challenge that determination, Genex's decision is now final.

For reasons previously discussed, Snyder's fifth argument, in which he contends that his claims do not require the resolution of an issue within the TWCC's exclusive jurisdiction, also is without merit. Although Snyder insists that his claims arise solely from the compensability dispute, he has consistently maintained that the damages that he sought and which the jury awarded arose from the Adjusters' "conduct in delaying medical treatment for Snyder's injury." As a result of waiver, Snyder has not and cannot exhaust administrative remedies regarding this issue.

### E. Absence of Remaining Claims

■ Although Snyder correctly notes that the Adjusters did not challenge the sufficiency of the damage evidence, it nevertheless is our responsibility to determine if any part of the case can be affirmed or remanded or whether the entire case must be dismissed. *Cf. Killion*, 50 S.W.3d at 22 (reversing and remanding for new trial because the reviewing court was "unable to determine which of the damages award-

ed were attributable to injury within the trial court's jurisdiction and which were truly dependent upon the jury finding that [the claimant] was entitled to back surgery under the Act"). We therefore have searched the record to determine if, after setting aside any determination that spinal surgery was medically necessary in December 2002, the trial court could properly exercise jurisdiction over any of Snyder's claims. But as actually tried, each claim and damage award was dependent upon a finding that Snyder needed surgery before April 2004.

From voir dire through closing argument, Snyder's case was framed as one of delay:

> [The Adjusters] looked for an excuse, didn't pay, caused a lot of problems independent of the original injury because of delay.[27]
>
> . . .
>
> [D]elay, delay, delay, playing games, gamesmanship. It's a weapon. . . . Delay is a weapon. . . . It's a weapon just like you take a gun to somebody's head when you use delay that way . . . Look at the condition they left him in. . . . Is there any doubt that because of the delay this man's body was incredibly damaged?[28]

As Snyder testified:

> Q: In this case, your complaint is that you wanted that neck surgeon [sic] back when Dr. Esses recommended

---

*agreed to pay.*" *Id.* at 656 (emphasis added). The First Court of Appeals held that the Benefit Dispute Agreement constituted "a final determination that benefits were due to Ruttiger"; therefore, Ruttiger was not required to pursue the compensability dispute through all four tiers of administrative proceedings. *Id.* at 657–58. Moreover, the court emphasized that "there is no suggestion in the record that, following the parties' entry into the Benefit

Dispute Agreement, any dispute remained regarding what specific benefits Ruttiger was entitled to recover." *Id.* at 658 n. 8. In contrast, there is no agreement here that Snyder's spinal surgery was medically necessary in December 2002.

**27.** Voir dire by Snyder's counsel.

**28.** Closing argument by Snyder's counsel.

it for you in December of 2002; isn't that right?

A: Yes, sir.

Q: You're not complaining that there was an interruption in your wage benefits, are you, Mr. Snyder?

A: Do what now?

Q: You kept getting your wage benefits and you're still getting them and you're not complaining in this case that there was some wrongful or bad interruption in your wage benefits, are you, sir?

A: No.

His wife similarly testified:

Q: Until that time, until you got the BRC [benefit review conference], you thought, okay, we're still getting the income benefits, right?

A: Yes.

Q: Some of his medical is being paid for?

A: Some of it, yes.

Q: But they're not agreeing to this surgery, right?

A: That's true.

Q: And that seems to be the gist of it?

A: That's what I knew.

Q: And based on your conversations with our husband, was it your understanding that's the way he understood it as well?

A: As far as I know. Basically, all I can remember is that we were just concerned about trying to get the surgery approved and that was our whole point, and let the attorneys deal with it.

The record contains no evidence of any basis for the jury's award of damages for physical pain and suffering, physical impairment, and loss of earning capacity other than delayed surgery, and the trial court lacked jurisdiction to award such damages. Even Snyder's mental anguish was attributed to a delay of surgery. According to Snyder, when he learned the effects of the delay, it "was one of the most devastating moments in [his] life." Dr. Esses similarly testified that "as a result of delay in appropriate treatment, [Snyder] has a chronic pain syndrome" and "part and parcel of chronic pain syndrome is depression and frustration and anxiety." Snyder's treating physician agreed that Snyder suffered "anxiety and depression as a direct result of delay in surgery." In contrast, with the exception of the claims related to the alleged delay of necessary surgery, Snyder failed to offer " 'direct evidence of the nature, duration, or severity of [his] anguish, thus establishing a substantial disruption in [his] daily routine,' or other evidence of 'a high degree of mental pain and distress' that [was] 'more than mere worry, anxiety, vexation, embarrassment, or anger.' " *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex.1996) (quoting *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex.1995)). For example, Snyder testified only that when he got the TWCC–21, "I was incredulous. I couldn't believe it." When asked, "Bother you when other folks don't do what they're supposed to?" Snyder responded, "Yes, a lot."

Florence Snyder offered no evidence of mental anguish other than sadness from being unable to finish a home renovation after Snyder's injury. When Snyder could no longer do the work himself, the couple had to pay others to do so, and were unable to finish the renovation. Mrs. Snyder originally had planned to have a family reunion when the project was finished, but her sister has since died. Snyder was questioned as follows about his reaction to his wife's experience:

Q: You've seen your wife today. You've watched how this has affect-

ed her, but how does it affect you having to watch her go through this, too?

A: I can handle me. Mentally, I can. I can take a lot. I don't—when she gets hurt, I get furious. I love her very much.

Q: You've got a lot of anger. Is that all you've got?

A: No.

Q: What do you mean?

A: It makes me very sad what's happened.

Q: Quitter?

A: Trust people to do what they say they're going to do and then they don't. That's sad.

In sum, we have found no evidence of mental anguish that is not based on the assertion that the Adjusters caused Snyder physical harm and impairment by wrongfully delaying surgery. *Cf. Killion,* 50 S.W.3d at 22. To the contrary, the record demonstrates that all of the damages awarded were based on claims outside the trial court's jurisdiction.

### III. CONCLUSION

We conclude that Snyder failed to exhaust administrative remedies, and the trial court has no jurisdiction to award damages based on the delay or denial of the first preauthorization request because the TWCC was not asked to determine whether that request was wrongfully denied.[29] That question was waived in the TWCC; thus, the impediment to the trial court's jurisdiction cannot be removed.[30] We

therefore sustain the Adjusters' eighth issue, vacate the trial court's judgment, and dismiss Snyder's claims with prejudice.[31] In light of our disposition of this issue, we do not reach the Adjusters' remaining issues, and Snyder's cross-appeal is moot.[32]

---

**29.** See *Malish v. Pac. Employers Ins. Co.,* 106 S.W.3d 744, 746 (Tex.App.-Fort Worth 2003, no pet.) (citing *Fodge,* 63 S.W.3d at 803).

**30.** See *Fodge,* 63 S.W.3d at 805.

**31.** See *State ex rel. Latty v. Owens,* 907 S.W.2d 484, 486 (Tex.1995) (per curiam).

**32.** See *In re H & R Block Fin. Advisors, Inc.,* 262 S.W.3d 896, 900 (Tex.App.-Houston [14th Dist.] 2008, orig. proceeding) (explaining mootness doctrine).